Jeffrey Goulder (No. 010258)
Alisa C. Lacey (No. 010571)
Michael Vincent (No. 029864)
Clarissa C. Brady (No. 036312)
**STINSON LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Jeffrey.Goulder@stinson.com
Alisa.Lacey@stinson.com
Michael.Vincent@stinson.com
Clarissa.Brady@stinson.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 7 |
| Skyler Aaron Cook, | Case No. 2:20-bk-01730-EPB |
| Debtor. | |
| James E. Cross, Trustee, | Adversary No. 2:21-ap-00336-EPB |
| Plaintiff, | |
| vs. | **THIRD AMENDED COMPLAINT** |
| Valliance Bank, Shelby Bruhn, Katherine S. Bruhn, | **(§ 544, 548, 550 Avoidance, Knowing Participation in Breach of Fiduciary Duty, Negligence)** |
| Defendants. | |

Plaintiff, James E. Cross, in his capacity as Chapter 7 Trustee, for his Second Amended Complaint against Defendants, alleges as follows:

## NATURE OF THE CASE[1]

1. The Trustee asserts claims for the avoidance of fraudulent transfers from Cook and his alter ego entities to Valliance Bank ("**Valliance**"), and for knowing participation in Cook's breach of fiduciary duties to Cook's "Partners" (hereafter defined), who ultimately became creditors of the Cook bankruptcy estate. Trustee seeks affirmative recovery from Valliance and from Texas Market President and Chief Lending Officer of Valliance, Shelby Bruhn ("**Bruhn**"), and his wife Katherine Bruhn, (together, the "**Defendants**"). The Trustee seeks to avoid and recover all fraudulent transfers made pursuant to sections 544, 548 and 550 of the Bankruptcy Code and pursuant to Section 24.001 et seq. of the Texas Business and Commerce Code ("**TUFTA**"). Subject to proof, the Trustee also seeks to avoid and recover from the Defendants, or any other person or entity for whose benefit such transfers were made, pursuant to section 550 of the Bankruptcy Code, any transfers that may be voidable pursuant to this Complaint. In addition to avoiding the fraudulent transfers made to the Defendants, the Trustee seeks, on behalf of the bankruptcy estate, damages as a result of the Defendants' participation in the fraudulent scheme and Defendants' knowing participation in Cook's breach of fiduciary duties to his Partners.

## PARTIES, JURISDICTION, AND VENUE

2. Plaintiff James E. Cross is the Chapter 7 Trustee (the "**Trustee**" or "**Plaintiff**") of the bankruptcy estate of Skyler Aaron Cook ("**Cook**").

3. Cook filed the Chapter 11, Subchapter V, petition on February 19, 2020 ("**Admin Case**").

4. On August 23, 2020, the U.S. Trustee's office filed a Motion to Convert the Admin Case to a Chapter 7 case.

5. The Court ordered the Admin Case converted to a Chapter 7 case on September 1, 2020. Trustee became the trustee in the Chapter 7 case.

---

[1] All capitalized terms shall have the meaning defined herein.

6. On December 7, 2020, the U.S. Trustee filed the *United States Trustee's Complaint to Deny Debtor's Discharge Under 11 U.S.C. § 727(a)(2), (3), and (4). See* Adversary No. 2:20-ap-00339-EBP, DE 1, 12/ 07/20 ("**727 Complaint**").

7. On February 23, 2021, the Court entered the Stipulated Order Approving Debtors' Waiver of Discharge pursuant to 11 U.S.C. § 727(a)(10).

8. Valliance Bank ("**Valliance**") is a banking corporation organized under the laws of the State of Oklahoma.

9. Shelby Bruhn ("**Bruhn**") is the Chief Lending Officer and Texas Market President at Valliance Bank and, upon information and belief, a resident of the State of Texas.

10. Bruhn and Katherine S. Bruhn are husband and wife. Bruhn took the actions that form the basis of this Complaint on behalf of his marital community. Together they own and manage Back 9 Capital, LLC ("**Back 9 Capital**").

11. This Court has subject matter jurisdiction over the Bankruptcy Cases and this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

12. Venue of the Adversary Proceeding in this district is proper under 28 U.S.C. § 1409.

13. This matter arises under the laws of the United States of America and Texas. The statutory predicates for certain of the relief sought herein is pursuant to sections 502, 544, 548, and 550 of the Bankruptcy Code, TUFTA, and Federal Rules of Bankruptcy Procedure 3007 and 7001.

14. This Adversary Proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F), (H), and (O), or is a proceeding related to a case under the Bankruptcy Code.

## **FACTUAL BACKGROUND**

### A. **"The Cook Enterprise"**

15. On or about February 25, 2014, Cook formed CMC Industries LLC ("**CMC Industries**"), an Arizona entity. CMC Industries was set up to be an "ad hoc little

makeshift construction company that helped with large general contractors, cleaning up their projects." Deposition of Skyler Cook ("Cook Depo")[2] at 11:2-12:9. Cook is, and at all relevant times was, the sole member of CMC Industries.

16.     In or about September 2014, Cook and his wife Chelsea Mei Cook purchased a home located at 3712 Hazel Drive, Fort Worth, Texas, 76244.

17.     In 2016, CMC Industries was performing construction clean-up services in Arizona and was not involved with managing properties or remodeling projects. CMC Industries reported net losses of $53,385 in 2016.

18.     In 2017, CMC Industries, existing with authorization to operate only in Arizona, shifted its operations and began flipping and renovating homes in Texas. CMC Industries' "flipping" process included working with real estate professionals in the Dallas/Fort Worth area to locate a potential property, finding Partners to purchase the property, contracting renovations, and splitting the profits once the property sold.[3] CMC Industries reported net profit of $206,009 in 2017.

19.     In January 2018, Cook formed three Texas entities: CKE Holdings LLC ("**CKE Holdings**"), CKE Home Management LLC ("**CKE Management**"), and Buddy's Renovation and Handyman Services LLC ("**BRHS**") (and together with Cook himself and CMC Industries, collectively referred to as the "**Cook Enterprise**").[4] All of such entities were controlled by Cook and were Cook's alter ego. At all relevant times, Cook held at least a 50% interest in each of the Cook Entities and was the primary person responsible for all financial oversight and control of each business, which included management of bank accounts, payroll, invoicing, billing and cash management.

---

[2]     References to the Deposition of Skyler Cook refer to the deposition taken on August 12, 2020, by Trial Attorney Larry Watson from the Office of the United States Trustee.

[3]     Haines Sharshiv, LLC was the main purchaser of the properties in 2017.

[4]     In 2018 there were two other "CKE" entities formed by Cook: (1) CKE Realty Fund; and (2) CKE Fund Management LLC. These entities are not included in the Cook Enterprise as defined herein. Cook was ousted from such entities in Fall of 2019.

20.     BRHS was formed by Cook and Caleb Thames on January 15, 2018 to renovate and refurbish homes for parties seeking to "flip" single family residences for profit ("**Flip Projects**"). BRHS provided renovation and remodeling services for third parties seeking renovation and resale ("**Client Projects**").[5] In addition, CKE Holdings, and other possible other Cook Enterprise entities, would purchase homes with the intent to renovate and resell them at a profit ("**Cook Projects**"). BRHS was tasked to perform the renovation for the Flip Projects. At all relevant times, Cook held a 50% interest in BRHS, however, Cook was the only person responsible for the financial oversight of the business, which included management of bank accounts, payroll, invoicing, billing and cash management.

21.     CKE Holdings was formed by Cook and Nishendu Vasavada on January 15, 2018 to purchase properties, renovate them and hold them to sell for profit. At all relevant times, Cook held a 50% interest in CKE Holdings, however, Cook was the only person responsible for the financial oversight of the business, which included management of bank accounts, payroll, invoicing, billing and cash management.

22.     CKE Management was formed by Cook and Nishendu Vasavada on January 18, 2018 to manage certain real properties including collection of rent, providing for maintenance and repairs, maintaining insurance, etc. At all relevant times, Cook held a 50% interest in CKE Management, however, Cook was the only person responsible for the financial oversight of the business, which included management of bank accounts, payroll, invoicing, billing and cash management.

23.     Cook attempted to create cash flow for BHRS in three different ways:

(i)     Cook created agreements commonly referred to as a "Buddy's Renovation and Handyman Services LLC Partnership Agreement" ("**BRHS Partnership Agreement**") and sought out parties willing to put up funds in return for the promises in

---

[5]     Clients included Nishendu Vasavada, Avocado Homes, LLC (principal Eric Hassberger), Steve Necessary, and Shelby Bruhn through his entity Back 9 Capital, LLC.

the agreement.[6] The BRHS Partnership Agreements were drafted by Cook personally, and provided for guaranteed returns and repayment. As an example of a structure (there was some variance), on August 29, 2019, BRHS signed a partnership agreement with Brian Shahan, in which Mr. Shahan funded $200,000 to BRHS in exchange for a "Guaranteed Quarterly Return of 5%" and a return of principal in July 2020. The returns were "guaranteed" on properties owned and operated by BRHS (though no liens were provided), as well as from BRHS "profits" from the Cook Projects and Client Projects. Cook represented that capital from parties that entered into BHRS Partnership Agreements (hereafter "**Partners**") was to be used as working capital for BRHS. Cook fraudulently induced BRHS Partners to enter into such agreements to provide funds to BHRS by providing them with his personal financial statement ("**Financial Statement**") that falsely stated that Cook had a net worth that exceeded $4 million. BHRS Partnership Agreements often recited that Mr. Cook personally guaranteed the promised returns and repayment. Cook has admitted under oath that the Financial Statement falsely stated his net worth and listed assets that he never possessed including real estate interests, interests in family trusts, a cash value life insurance policy in the amount of $3.5 million, etc. *See* Cook Deposition at 105:18-107:13.

(ii)      The second source of funding for BHRS came through the Flip Projects. The purchasers of the properties for the Flip Projects would pay in three installments. The first installment was paid upon the completion of the tear down stage. The second installment was paid at the framing and drywall stage. The third installment was paid upon completion of the renovation/remodel. In some instances, BRHS was to participate in a percentage of the net profit of the Flip Project upon the sale of the residence.

(iii)      The third source of funding came from Client Projects which were

---

[6]      Cook's fundraising scheme using the BHRS Partnership Agreements resulted in Cook's sale of unregistered securities in the State of Texas. (*See United States Trustee's Complaint to Deny Debtor's Discharge Under 11 U.S.C. § 727(a)(2), (3), and (4)*, *See* 727 Complaint, ¶ 32, p. 9 of 22.

billed in the same manner as the Flip Projects through the different stages. Funds generated from a Client Project was realized upon its completion and final payment. On information and belief, the net proceeds of the resale of a Client Project were split between the Client and Cook—generally, after all expenses and loans were repaid, the first $20,000 went to the Client, the second $20,000 went to the Cook Enterprise and the balance of proceeds (if any) were split between the Client and Cook.

24. Cook regularly transferred BHRS capital from BHRS to CKE Holdings, CKE Management, CMC Industries, and to himself personally. BHRS experienced a liquidity crisis for BHRS starting at the end of 2018, which continued and became extreme.

25. In 2018, CKE Holdings reported a loss of $226,123, CKE Management reported a loss of $7,858, and BRHS reported a loss of $342,259.

**B.** **The Relationships between Cook, Bruhn, and Valliance**

26. By at least early 2018, Cook and his wife had become close family friends with Bruhn and his wife. The Cooks and the Bruhns were congregants at the same church, their wives had similar interests (home redecorating and design), and, on information and belief, their children were of similar ages. The personal relationship between Bruhn and Cook eventually led to a *de facto* partnership in which they conducted various business dealings.

27. Evidence of this partnership includes Cook's authority to sign on behalf of Back 9 Capital (an entity owned and managed by Bruhn) through which Bruhn participated in a number of Client Projects. Trustee is aware that Back 9 Capital participated in at least three (3) Client Projects with the Cook Enterprise. For example, on July 19, 2018, Cook signed an Agreement to Assign Purchase and Sale Agreement with regard to the property located at 3024 Portales Drive, Fort Worth, TX 76116, on behalf of Back 9 Capital, the purchaser. *See* Agreement to Assign Purchase and Sale Agreement, attached hereto as Exhibit 1.

28. In 2018, Cook opened several accounts at Valliance for BRHS, including a

payroll account with an account number ending in 2806 and an operating account with an account number ending in 8416.

29. Cook also opened other accounts with Valliance in 2018, including a CMC Industries operating account having an account number ending in 8572, a CKE Holdings operating account with an account number in 8408, and a CKE Home Management operating account having an account number ending in 8606.

30. Cook and Chelsea Mei Cook also opened up a joint personal savings account with Valliance in January 2019.

31. Cook opened accounts at Valliance for CKE Fund Management, having an account number ending in 2657, and CKE Realty Fund, having an account number ending in 2665.

32. Cook would introduce parties interested in acquiring properties to Bruhn for purposes of having Valliance provide the financing for Client Projects on which BHRS would provide renovation services on the Flip Projects. Bruhn arranged for Valliance to provide a "quick and easy" lending system for Client Projects in order for Cook to easily attract Clients. Trustee is informed that Valliance would require a 20-25% down payment on the property, and a cash deposit in a Valliance account or accounts. Valliance would provide the financing to the Client to purchase the property through a relatively short term note or credit line (six to nine months) on which Valliance would charge interest only. Once a client indicated an interest in renovating property, Cook would simply have the Client transfer cash to Valliance, and Valliance would have all necessary documentation ready to sign and would coordinate all details with the title company. As a result, Valliance obtained additional bank accounts from clients, and additional loans on Client Projects, as the result of Cook's marketing.

33. Cook solicited Partners in BHRS and Client Projects with the help of Bruhn and the support of Valliance. For example, in October 2018, Cook drafted an email titled "Valliance Bank Introduction," which Brad Johnson (then working with Cook as a realtor) would forward to potential Client Project and BHRS Partners (in that example, the e-mail

was sent to Steve Necessary and Parker Keane of Keane Landscaping, Inc. & Texas Trees) and was copied to Bruhn. Such e-mails would make an "introduction" to the bank. The introduction email states: "As discussed ***Valliance Bank will be doing the financing on all of our projects***, giving all of us an institutional backing ***that protects you, gives you accountability and transparency*** before and during the projects as well as allowing you to leverage your dollars for more projects." (emphasis added). *See* October 17, 2018 Email correspondence attached hereto as Exhibit 2.

34.     On information and belief and subject to further discovery in this case, Bruhn himself, or through entities in which he had an interest (including Back 9 Capital), purchased at least three houses at Cook's recommendation and hired BRHS to renovate those homes for resale, creating a potential conflict of interest with his employer and a possible violation of Valliance's code of conduct.

## C.  Defrauding BHRS "Partners"

35.     The Cook Enterprise started to experience what turned out to be an irreversible financial crisis beginning in about September 2018.

36.     On September 21, 2018, Karin Hubman, a Loan Administrative Assistant with Valliance, emailed Cook to verify that Valliance was moving $6,401.75 from BRHS's operating account to the payroll account to cover a negative balance.

37.     On November 28, 2018, an accountant with Cook's CPA, Badger CPA Firm, emailed Cook to inform him that the payroll account for BRHS had only $170.48 in the account but payroll that Friday required $17,772.22.

38.     According to the financial statements produced by Cook's CPA, BRHS had a net income of ***negative $686,062.19*** in 2018.

39.     Despite such a substantial loss and continuing BRHS insolvency, Cook continued to solicit BHRS Partnership Agreements, using his fraudulent personal financial statement and other misrepresentations, to solicit funding for BRHS, promising high rates of return and repayment.

40.     Between May 2018 and August 2019, the Cook Enterprise collected more

than *$4 million* from BHRS Partners. Noteworthy is the fact that most of these amounts were solicited from and after the Cook Enterprise 2018 financial crisis had commenced. The following BHRS Partners have filed proofs of claim as creditors in the bankruptcy case:

| Date | Investor/Creditor | Amount Invested | Claim No. |
|---|---|---|---|
| 8/22/2018 | Brad Johnson (dba Black Dog Homes) | $175,000 | 31 |
| 9/2/2018 | Mathew Delgadillo | $50,000 | 6 |
| 10/25/2018 | Steve Necessary | $250,000 | 12 |
| 11/14/2018 | Real Estate Future Investments, LLC | $100,000 | 25 |
| 11/19/2018 | Teresa K. Anderson | $50,000 | 21 |
| 12/4/2018 | Brad Johnson | $50,000 | 28 |
| 12/4/2018 | Ryan Moran | $125,000 | 29 |
| 12/20/2018 | Jeff and Brenda Thames | $200,000 | 15 |
| 4/17/2019 | Steve Necessary | $750,000 | 12 |
| 4/24/2019 | Haines Sharhiv, LLC | $200,000 | 22 |
| 5/3/2019 | Grayson Buster | $30,000 | 7 |
| 5/13/2019 | Dennis Rocke | $150,000 | 20 |
| 6/14/2019 | Real Estate Future Investments, LLC | $35,000 | 25 |
| 7/16/19-9/6/19 | CKE Realty Fund, LP | $305,000 | 26 |
| 7/25/2019 | Ohana Waiwai, LLC | $50,000 | 27 |
| 7/25/2019 | Ryan Moran | $50,000 | 29 |
| 7/29/2019 | Mathew Delgadillo | $100,000 | 6 |
| 8/16/2019 | Ohana Waiwai, LLC | $45,000 | 27 |
| 8/16/2019 | Ryan Moran | $35,000 | 29 |
| 8/29/2019 | Brian Shahan | $200,000 | 14 |
| | Caleb Thames | $20,000 | 19 |
| | Cam Dennis | $75,000 | 32 |
| | Quantum3 Group LLC | $8,000 | 40 |
| | **Total Claims by "Partners" against Cook:** [7] | **$3,053,000** | |

## D.    The Bounced Checks and Overdraws at Valliance---Debts to Valliance

41.    Between January 2019 and August 2019, Cook's entities bounced checks drawn on accounts held at Valliance at least *257 times*.

---

[7]    The Claims Register Summary reports $3,695,061.58 as the total amount claims. Accordingly, the claims of the Partners total approximately 83% of all claims. Remaining claims are for services that BHRS was paid for, but BHRS failed to deliver. Such claims also likely resulted from the conduct set forth in this case.

42.     Valliance's January 2019 statement for BRHS's operating account showed that BRHS bounced 73 checks and incurred $2,190 in bounced check fees.

43.     Valliance's February 2019 statement for BRHS's operating account showed that BRHS bounced 11 checks and incurred $330 in bounced check fees.

44.     Valliance's March 2019 statement for BRHS's operating account showed that BRHS bounced 43 checks and incurred $1,290 in bounced check fees.

45.     Valliance's April 2019 statement for BRHS's operating account showed that BRHS bounced 45 checks and incurred $1,350 in bounced check fees.

46.     Valliance's May 2019 statement for BRHS's operating account showed that BRHS bounced 35 checks and incurred $1,050 in bounced check fees.

47.     Valliance's June 2019 statement for BRHS's operating account showed that BRHS bounced 31 checks and incurred $930 in bounced check fees.

48.     Valliance's July 2019 statement for BRHS's operating account showed that BRHS bounced 15 checks and incurred $450 in bounced check fees.

49.     Valliance's August 2019 statement for BRHS's operating account showed that BRHS bounced 4 checks and incurred $120 in bounced check fees.

50.     On many occasions, some of which are listed below, Valliance employees informed Cook regarding overdrafts in the BRHS account and copied Bruhn on those emails.

51.     Upon information and belief, Bruhn was aware of these instances of overdrafts and bounced checks.

52.     On January 15, 2019, Trinika Johnson ("**Johnson**"), a lending assistant with Valliance who worked closely with Bruhn, emailed Cook to ask if Cook would be making a deposit that day into the BRHS account.

53.     On February 15, 2019, Johnson emailed Cook to report that a check had been returned as altered/fictitious and that BRHS would be charged back.

54.     On April 25, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's account was overdrawn by $32,359.34.

55. On May 2, 2019, Jennifer Lane at Valliance notified Teresa Anderson, an investor in BRHS, that checks from BRHS had been rejected for insufficient funds.

56. On May 10, 2019, Johnson emailed Cook, cc: to Bruhn, to ask if Cook would be making a deposit to cover an overdraft.

57. On May 16, 2019, Johnson emailed Cook, cc: to Bruhn, to state that Bruhn was in a board meeting that morning and Valliance needed a deposit to cover an overdraft in the BRHS operating account by noon that day.

58. On May 17, 2019, Chassidy Walker, a Deposit Operations Manager with Valliance, emailed Cook to state that one of Cook's accounts, *8408, was recently reopened and two pending transfers needed to be resubmitted.

59. On May 17, 2019, Johnson emailed Cook, cc: to Bruhn, asking Cook to transfer funds from the BRHS payroll account to the operating account to cover the overdraft in the operating account.

60. On May 28, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn by $21,989.71.

61. On May 29, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn by $21,947.41.

62. On June 4, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating and payroll accounts were both overdrawn.

63. On June 5, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

64. On June 7, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

65. On June 10, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

66. On June 11, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating and payroll accounts were both overdrawn.

67. On June 12, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's

operating and payroll accounts were both overdrawn.

68. On June 13, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

69. On June 17, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

70. On June 21, 2019, Johnson and Cook emailed regarding checks that Valliant had determined were fraudulent.

71. On June 24, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn.

72. On June 28, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

73. On July 3, 2019, Johnson emailed Cook, cc: to Bruhn, stating that a large check posting to the BRHS operating account caused it to be overdrawn by $41,025.

74. On July 5, 2019, Johnson emailed Cook, cc: to Bruhn, stating that items posting to the BRHS account caused it to be overdrawn by $34,440.07.

75. On July 9, 2019, Johnson emailed Cook, cc: to Bruhn, stating that a large American Express payment posting to BRHS's operating account was causing the account to be overdrawn by $43,248.40.

76. On July 15, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

77. On July 16, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's account was overdrawn.

78. On July 19, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

79. On July 23, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

80. On July 24, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

81.     On July 26, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

82.     On July 29, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn.

83.     On August 2, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn by $101,000 and CKE Holdings' account was also overdrawn.

84.     On August 8, 2019, Johnson emailed Cook with a cc: to Bruhn, stating that BRHS's operating account was currently overdrawn because of a credit card payment.

85.     Valliance and Bruhn knew that Cook was repeatedly shifting funds between accounts, a suspicious activity (Ponzi scheme) that was reportable under Valliance's anti-money laundering (AML) policies and procedures.

86.     One of the hallmarks of a Ponzi scheme is moving money from one account to another where monies from new creditors or investors are used to cover payments to earlier creditors/investors, and large deposits with extremely low account balances. Such transactions serve no legitimate business purpose and as such should have been identified, investigated, and reported as "suspicious" transactions under Valliance's anti-money laundering (AML) program.

87.     For January 2019, BRHS's operating account had an average daily balance of $4,496.93 but $410,708.31 in deposits for the month.

88.     For February 2019, BRHS's operating account had an average daily balance of $15,370.51 but $354,088.88 in deposits for the month.

89.     On March 28, 2019, Cook transferred $100,000 from the BRHS payroll account to the operating account.

90.     For March 2019, BRHS's operating account had an average daily balance of $8,643.02 but $415,093.36 in deposits for the month.

91.     For April 2019, BRHS's operating account had an average daily balance of $15,681.73 but $763,709.91 in deposits for the month.

92. For May 2019, BRHS's operating account had an average daily balance of $6,673.82 but $251,138.96 in deposits for the month.

93. For June 2019, BRHS's operating account had an average daily balance of $1,473.95 but $78,063.66 in deposits for the month.

94. Cook regularly shifted funds among his accounts at Valliance and at other banks. In addition to writing large numbers of checks between accounts, he would transfer money back and forth. For example, in February 2019, BRHS's operating account received $22,000 from the CKE Holdings operating account and $33,000 from BRHS's payroll account.

95. As another example, in March 2019, BRHS's operating account received multiple transfers from the CKE Holdings operating account: $65,000 on March 1, $10,000 on March 4, $15,000 on March 4, and $10,000 on March 5.

96. In addition to these transfers, Cook frequently deposited a high volume of checks drawn on his other accounts into the BRHS operating account, and vice versa.

97. The pattern of NSF occurrences and fraudulent transactions Cook carried out at Valliance, with the knowledge of Bruhn, was extraordinary. Ultimately, Cook paid Valliance the amounts owed on the overdraws and NSF amounts from BHRS, from the funds provided from the BHRS Partners. Such payments were made while Cook knew or should have known that the Cook Enterprise was insolvent, and with the actual intent of hindering, delaying and defrauding the creditors of the Cook estate, including the BRHS Partners.

98. Cook's *Schedules and Statement of Affairs* were filed on February 19, 2020. Debtors' requested that the Schedules and Statements be filed under seal, Admin DE 3, and as a result are still not publicly available. However, the Statement of Affairs does not reflect any payments to Valliance to satisfy such debts within the two (2) year avoidance period. Cook did not otherwise report any payments to Valliance. No claims were filed by Valliance in the bankruptcy case.

99. In addition, the U.S. Trustee's efforts to fully investigate the conduct of

Cook's activities leading to the filing of the case was additionally hampered by Cook's failure to turnover numerous documents withheld by Cook from production to the U. S. Trustee. The U. S. Trustee discovered the withholding of documents when Chelsie Mei Cook was deposed and disclosed that such documents were held by Cook in the garage at their Arizona home.

100. As a result of Cook's failure to disclose and other difficulties with cooperation, the precise amount paid on debts to Valliance that accrued during the extraordinary series of improper conduct is currently unknown to Trustee, but is alleged to be not less than *$303,719.93* (based on amounts set forth above). Despite the incredible series of substantial overdraws, Cook, Bruhn and Valliance managed to assure that Valliance received payment in full at the expense of all other creditors of the Cook estate.

101. At times when the Cook Enterprise was insolvent, Cook, with the knowledge and consent of Bruhn and Valliance, continued to solicit parties to become Partners and provide funding to BHRS, and succeeded in attracting funding. When Cook obtained the funding, it was frequently deposited to BHRS accounts at Valliance, or to BHRS's account at Wells Fargo. Funds were then transferred from the BHRS Wells Fargo account to Valliance.

102. Certain creditors maintained funds on deposit at Valliance, and, in some cases, Valliance itself transferred the party's funds from the party's Valliance accounts to BHRS accounts (both at Valliance and at Wells Fargo) when the party agreed to become a BHRS Partner. For example, Johnson (the *same person* at Valliance that was also simultaneously sending BHRS the numerous NSF e-mails) performed the transfer of Mr. Necessary's funds on deposit at Valliance to BHRS on multiple occasions.

103. In August of 2019 Bruhn expressed directly to one of the creditors (Mr. Necessary) that Bruhn believed amounts owed to Valliance were paid with the funds provided by that creditor to BHRS (as a BHRS Partner), and essentially "thanked" the creditor for getting Valliance paid. Given the number of overdraw notifications as detailed herein, it is not precisely known how much the Partner funding to BHRS ended up

benefitting Valliance. However, Cook deposited such funding to Valliance at times when he knew or should have known that Cook was insolvent and the transfers to Valliance would hinder, delay and defraud such Partners/creditors in the Cook case.

**D. Fraudulent Transfers**

104.  Based on the documents produced by Cook, Valliance provided the financing on most, if not all of the Cook Projects and Client Projects.[8]

105.  In the two years before the Petition, between February 19, 2018 and February 19, 2020 (the "**Avoidance Period**"), Valliance received payments of not less than, subject to further discovery in this case, $451,961.08 on the loans it provided to CKE Holdings.[9]

| Loan Date | Rec. Date | Document | Loan No. | Amount | Property | Payments to Valliance |
|-----------|-----------|----------|----------|--------|----------|-----------------------|
| 3/19/18 | 4/18/18 | Modification | 8107280 | $320,000 | 2205 Forest Hills Rd., Grapevine, TX 76051 | $319,722.89 (6/15/2018) |
| 6/20/18 | 6/27/18 | Deed of Trust | 8109450 | $95,000 | 5724 MacGregor Dr., Haltom City, TX 76148 | $92,238.19 (10/23/2019) |
| 6/20/18 | 6/27/18 | Assignment of Rents | 8109450 | | 5724 MacGregor Dr., Haltom City, TX 76148 | |
| 6/20/18 | 6/27/18 | Deed of Trust | 8109500 | $40,000 | 2713 Westbrook Ave, Fort Worth, TX 76111 | $40,000 (est.) |
| 6/20/18 | 6/27/18 | Assignment of Rents | 8109500 | | 2713 Westbrook Ave, Fort Worth, TX 76111 | |
| | | | | | **Total in Avoidance Period (Est.):** | **$ 451,961.08** |

106.  Further, to the extent that Client Projects or Cook Projects required completion by BHRS, Valliance was motivated by its own self-interest in getting the properties' renovations completed, and back on the market in order to get the underlying loans related to those properties and owed to Valliance paid.

---

[8]    The only exception that Trustee is aware of is that Bruhn used Providence Bank to provide financing on Bruhn's Client Projects.

[9]    Valliance was also financing Client Projects that relied on the services of BHRS to perform the renovations in order to bring the properties to condition for resale. The resale had to occur in order to repay Valliance the notes or credit lines provided to the Clients. As a result, Valliance was highly motivated to have BHRS complete renovation services.

107.   In addition, as the results of overdrafts and account transfers, etc. that existed in starting in 2018 to September 2019, the Cook Enterprise owed amounts to Valliance Bank at varying times throughout that period. The precise amount of such obligations will be determined through discovery in this case, but based on information known so far, is believed to be not less than $303,719.93 as set forth above.

**E.  Cook Breaches His Fiduciary Duty to Partners**

108.   Cook failed to disclose to BRHS Partners that the Cook Enterprise (including BHRS) was insolvent. Cook solicited and collected investments in the Cook Enterprise through August 2019.

109.   Cook failed to disclose to Partners that he was engaged in circular intercompany transactions (i.e. a Ponzi scheme) to maintain the appearance of liquidity in the Cook Enterprise accounts. Cook failed to notify Partners that he used the funds provided by Partners to satisfy outstanding obligations owed to Valliance, among other things.

110.   Cook owed a fiduciary duty to Partners to disclose all material facts surrounding funding to BRHS, including his insolvency, that Cook was transferring funds between accounts to keep his entities afloat, and that funds were being used to satisfy obligations to Valliance, with incurring further obligations to partners.

111.   Cook owed a fiduciary duty to his Partners to keep their funds segregated in the respective entity in which they invested, and not commingle funds.

112.   Cook breached his fiduciary duties to his Partners.

113.   Cook's breach of his fiduciary duties to Partners caused the Partners to suffer losses, including the claims filed by such Partners in the Cook bankruptcy case totaling not less than $3,053,000.

**F.  Valliance and Bruhn Knowingly Participate in Cook's Breach of Fiduciary Duty**

114.   A number of the BHRS Partners were also holders of accounts at and were customers of Valliance Bank. For example, Mr. Necessary reports having lunch with

Bruhn at a time prior to August 2019, and reports that Bruhn was unresponsive and "preoccupied" during such lunch. Bruhn was aware that Mr. Necessary was involved in Client Projects, and had invested as a BHRS Partner, at the time of that lunch and failed to inform Mr. Necessary of the precarious financial situation of the Cook Enterprise. Thereafter, Mr. Necessary entered into a subsequent BHRS Partnership Agreement.

115. In August 2019, Caleb ("Buddy") Thames, Jeff Thames, and Cook met with Bruhn to discuss the fact that BHRS was then operating at a loss of approximately $3,000,000. Bruhn's information concerning the extent of the loss turned out to be a stunningly accurate estimate of claims resulting from BHRS Partnerships that resulted in claims being filed against the bankruptcy estate. Yet, Bruhn and Valliance did not cease BHRS' banking or business activities with Valliance, or take any action to avert Cook's continued activities.

116. During fall 2019, the Cook Enterprise ceased operations, and Cook was sued by certain parties for fraud and breach of fiduciary duty. Cook and his wife fled, virtually overnight, from Texas to Arizona.

117. Cook had been serially and materially overdrawing the Valliance bank accounts since September 2018. Upon information and belief, Bruhn had knowledge of the persistent overdrafts and serial account transfers. Bruhn himself was copied on many of his staff's communications with Cook.

118. During this period, Bruhn and Valliance were assisting Cook in soliciting and encouraging Partners to provide funds to BHRS and/or the Cook Enterprise. Bruhn permitted Cook to use references to Valliance in his communications with Partners, and proposed Partners. For those parties that had accounts at Valliance, Valliance itself would transfer funds from the party to BHRS when the party agreed to enter into a BHRS Partnership Agreement.

119. Further, Bruhn and Valliance failed to cease banking operations for Cook during the persistent overdrafts and serial account transfers, despite Bruhn's knowledge of such conduct.

120.    Bruhn's and Valliance's failure to cease Cook's operations at the inception of the financial improprieties, instead of months and months later, was driven by Bruhn's and Valliance's self-serving desire to protect the Cook Enterprise long enough that it would satisfy obligations to Valliance at the expense of parties providing new funding to the Cook Enterprise. Valliance and Bruhn assisted the Cook Enterprise in remaining operational.

121.    Valliance had a duty to detect and prevent Ponzi scheme activities and suspicious "red flag" transactions that served no legitimate business purpose.

122.    Normal and customary banking practices would have resulted in the closure of Cook's accounts at Valliance because of the repeated overdrafts.

123.    Valliance violated internal bank policies and procedures developed in support of federal banking laws regarding unauthorized extensions of credit by clearing checks against insufficient funds.

124.    Valliance should have flagged Cook's activities as suspicious because of the unusual activities in the accounts, including consistently large volumes of deposits with extremely low account balances, significant numbers of insufficient funds checks returned, and other suspicious account transactions, which appeared to be inconsistent with the operation of the underlying business.

125.    Valliance instead allowed Cook to operate his accounts in overdraft for extended periods of time, which is a violation of federal safety and soundness laws, as well as customary banking practices.

126.    Valliance should have flagged Cook's repeated circular intercompany transactions, including depositing checks and transfers between accounts, as suspicious transactions which served no legitimate business purpose.

127.    Instead of closing Cook's accounts, Valliance and Bruhn suggested that Cook shift, or in some cases Valliance personnel shifted, funds from one Cook Enterprise account to another to cover the overdrafts. On information and belief, Partners funds were deposited in various accounts, and such suggestions or actions by Bruhn and Valliance

did not consider or protect Partner's funds.

128. By allowing Cook's accounts to remain open, Valliance willfully and intentionally aided and abetted Cook's scheme to defraud and breach his fiduciary duties to creditors and Partners, and permitted Cook to obtain additional investments when Cook was insolvent. Such losses have resulted in the claims filed in the Administrative Case.

129. Bruhn and Valliance's knowing participation in, and aiding and abetting Cook's breach of fiduciary duty, has damaged the bankruptcy estate resulting in dramatically increased claims by creditors which accrued during the period that the Cook Enterprise was insolvent, and Bruhn and Valliance were aware, or should have been aware, of such insolvency and that Cook's activities were to the detriment of Cook's present and future creditors.

## COUNT I

**(Avoidance and Recovery of Actual Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(A) and 550) (Valliance)**

130. Plaintiff incorporates the foregoing paragraphs as if set forth herein.

131. As set forth above, the Cook Enterprise made payments to Valliance to pay off the obligations to Valliance, and the Valliance loans, within two years of the Petition Date. Such payments were made at times when Cook knew or should have known that the Cook Enterprise was insolvent, and Cook made such payments with actual intent to hinder delay or defraud Cooks' then present and future creditors.

132. Pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover for the benefit of Cook's creditors and estate the transfers made to pay any debts, loans or advances from Valliance.

133. Accordingly, the Trustee is entitled to a judgement: (i) avoiding the transfers made to Valliance from February 19, 2018 to February 19, 2020, and (ii) recovering from Valliance an amount equal to all the payments the Cook Enterprise made to Valliance during the Avoidance Period.

## COUNT II

### (Alternatively, Avoidance and Recovery of Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(B) and 550) (Valliance)

134.    Plaintiff incorporates the foregoing paragraphs as if set forth herein.

135.    The Cook Enterprise made transfers to Valliance to pay off debts to Valliance and the Valliance loans within two years of the Petition Date.

136.    At the time of each of the transfers to Valliance or Bruhn, Cook knew or should have known that the Cook Enterprise was either (a) insolvent at the time of each of the transfers or became insolvent as a result of each of the transfers, in that the sum of Cook's debts were greater than all of Cook's assets at a fair valuation; (b) engaging in or about to engage in a business or transaction for which Cook's remaining assets were unreasonably small in relation to the business or transaction; or (c) intending to incur, or believed or reasonably should have believed that Cook would incur debts beyond his ability to pay such debts as they became due.

137.    The Cook did not receive reasonably equivalent value in exchange for each of the transfers to Valliance.

138.    Accordingly, the Trustee is entitled to a judgement: (i) avoiding the transfers made to Valliance from February 19, 2018 to February 19, 2020, and (ii) recovering from Valliance an amount equal to all the payments Cook made to Valliance during the 548 Period.

## COUNT III

### (Avoidance and Recovery of Actual Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1)) (Valliance)

139.    Plaintiff incorporates the foregoing paragraphs as if set forth herein.

140.    As set forth above, the Cook Enterprise incurred and paid amounts to Valliance with actual intent to hinder, delay, or defraud a present or future creditors of Cook.

141.    Pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover for the benefit

of the Cook's estate and its creditors the transfers made to Valliance.

142.     Accordingly, the Trustee is entitled to a judgement: (i) avoiding the transfers made to Valliance, and (ii) recovering from Valliance an amount equal to all the payments the Cook Enterprise made to Valliance.

143.     Pursuant to Tex. Bus. & Com. Code § 24.013, the Trustee is also entitled to recover his attorneys' fees and costs brought to recover the transfers.

## COUNT IV

**(Alternatively, Avoidance and Recovery of Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(2)) (Valliance)**

144.     Plaintiff incorporates the foregoing paragraphs as if set forth herein.

145.     As detailed herein, the Cook Enterprise paid debts, obligations and loans to Valliance, and such payments were transfers of Cook's interest in property.

146.     At the time of each of the transfer, the Cook Enterprise was either (a) engaging in or about to engage in a business or transaction for which Cook's remaining assets were unreasonably small in relation to the business or transaction; or (b) intending to incur, or believed or reasonably should have believed that the Cook would incur debts beyond their ability to pay such debts as they became due.

147.     Cook did not receive reasonably equivalent value in exchange for each of the transfers to Valliance.

148.     The Cook Enterprises had outstanding and unpaid creditors at the time of each of the transfers to Valliance, or creditors' claims arose within a reasonable time after each of the transfers, which claims currently remain unpaid.

149.     Therefore, transfers to Valliance constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), such that the Trustee is entitled to a judgment on behalf of Cook's estate to recover each of the transfers for the benefit of the creditors of the Cook estate.

150.     Pursuant to Tex. Bus. & Com. Code § 24.013, the Trustee is also entitled to recover his attorneys' fees and costs brought to recover the transfers.

## COUNT V

### (Knowing Participation in Breach of Fiduciary Duty) (Valliance and Bruhn)

151.    Plaintiff incorporates the foregoing paragraphs as if set forth herein.

152.    The Cook Enterprise had a fiduciary relationship to its Partners.

153.    Bruhn, knew the structure and business purpose of the Cook Enterprise and knew of Cook's fiduciary duty to his Partners. Bruhn understood the operation of BRHS and Cook's operation of soliciting investments in BRHS from third party Partners. As the Texas president of Valliance, Bruhn's knowledge is imputed to Valliance.

154.     Bruhn knew that Cook was continuing to solicit investments in the Cook Enterprise despite the fact that the Cook Enterprise was continually bouncing checks and engaging in transfers to cover serial and material overdrafts. As the Texas president of Valliance, Bruhn's knowledge is imputed to Valliance.

155.    Bruhn knew that Cook was breaching his fiduciary duties to his Partners because the Valliance account statements, among others, showed that Cook was receiving new investments throughout 2019 while Cook was also chronically and repeatedly bouncing checks, incurring repeated overdrafts, and transferring funds between accounts to cover liquidity problems. As the Texas president of Valliance, Bruhn's knowledge is imputed to Valliance.

156.    Bruhn knew of Cook's substantial overdrafts and bounced checks throughout 2019. As the Texas president of Valliance, Bruhn's knowledge is imputed to Valliance.

157.    Valliance and Bruhn also knew of Cook's business practices because they had approved loans from Valliance to the Cook Enterprise for the various real estate properties that the Cook Enterprise would purchase as part of his scheme in which he solicited third party investments. As the Texas president of Valliance, Bruhn's knowledge is imputed to Valliance.

158.    Valliance and Bruhn substantially participated in Cook's scheme by allowing him to maintain accounts at Valliance through 2019 in violation of sound

banking practices and federal laws, by allowing him to continually bounce checks during 2019, and suggesting and causing Cook to commingle accounts to cover overdrafts, among other acts.

159.    But for the willful and self-serving blindness of Valliance to these serial, material, and highly suspicious transactions, Cook would not have been able to continue soliciting additional Partner investments and commingling investor accounts.

160.    Valliance and Bruhn's conduct was a substantial factor causing harm to Cook's Partners and they knowingly participated in the breach of Cook's fiduciary duty to his Partners.

161.    As a result of the breach of Cook's fiduciary duty to his Partners, and Valliance and Bruhn's knowing participation in that breach, the Cook Enterprise continued in operation for longer than it otherwise would have. This continued operation resulted in the Cook Enterprise dissipating its assets through additional payoffs to earlier investors (e.g. Ponzi scheme behavior), defrauding additional Partners, and increased the debts that further harmed the Cook Enterprise and, now, increases the claims against the bankruptcy estate.

162.    Valliance and Bruhn's conduct was committed with malice or, alternatively, gross negligence, entitling the Trustee to an award of exemplary damages under Texas law.

## COUNT VI

### Negligence (Against Valliance Only)

163.    Plaintiff incorporates the foregoing paragraphs as if set forth herein.

164.    Cook owed fiduciary duties to all of his Partners.

165.    Bruhn knew of Cook's business operations, his solicitation of investments, and the general structure and operation of Cook Enterprise, including BRHS.

166.    Bruhn knew that Cook owed fiduciary duties to his Partners.

167.    Bruhn knew or should have known that Cook's repeated overdrafts and intercompany transactions violated Cook's fiduciary duties to his Partners.

168. Bruhn knew that Cook was misappropriating funds in his accounts, including the BRHS accounts, based upon, among other things, the frequent intercompany transfers.

169. Bruhn assisted Cook in committing the misappropriations by, among other things, privately meeting with Cook, lending his and Valliance's name to help Cook solicit new investments (for example, the October 17, 2018 email from Brad Johnson to Parker Keane)

170. As an officer of Valliance, Bruhn's knowledge is imputed to Valliance.

171. Valliance owed a duty of care to Cook's Partners to prevent Cook from using Valliance as a vehicle for furthering his breaches of the Partners' fiduciary duties.

172. Valliance breached its duty of care.

173. As a direct and proximate cause of Valliance's breach of its duty of care, the Cook Enterprise was damaged through the dissipation of assets and increasing liabilities to Cook's Partners, Cook's Partners were also damaged, and claims were filed against Cook in his bankruptcy case. Trustee seeks to recover from Defendants the amount of all Partners' claims in the bankruptcy case.

## COUNT VII

### Violation of RICO, 18 U.S.C. § 1962(d) (Against All Defendants)

174. Plaintiff incorporates the foregoing paragraphs as if set forth herein.

175. Trustee, Valliance, and Bruhn are persons within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

*The RICO Enterprise*

176. Valliance, Bruhn, and Cook were a group of persons associated together in fact for the common purpose of carrying out a criminal enterprise that operated as factually described in the preceding paragraphs of this Complaint. Namely, Valliance, Bruhn, and Cook engaged in the systematic recruitment of Cook's Partners in the Cook Enterprise for the purposes of obtaining investments so that (a) Cook could unlawfully profit by directing some or all of those investments for his personal use, (b) Cook could unlawfully profit by

prolonging the operation of the Cook Enterprise, thereby allowing him to continue charging fees for Flip Projects and Client Projects, (c) Valliance and Bruhn could unlawfully profit from the prolonged operation of the Cook Enterprise by earning additional income from the loans that Valliance would extend to the Cook Partners, and (d) Valliance and Bruhn could unlawfully profit by using the Cook Partners' investments to repay loans that Valliance had previously made to the Cook Enterprise.

177. Cook was the ringleader of the RICO Enterprise. He ran BRHS and the other entities that comprise the Cook Enterprise. Cook engaged in Flip Projects, Client Projects, and Cook Projects, and made fraudulent representations and promises to Partners to obtain cash flow for BRHS as set forth in the preceding paragraphs of this Complaint.

178. Bruhn and Valliance were primarily responsible for (1) assisting Cook's Partners to provide funds to BRHS and (2) enabling BRHS and the rest of the Cook Enterprise to continue to operate by providing banking services despite their frequent insolvency and overdrafts. To that end, Bruhn and Valliance processed loan applications from Partners and made decisions on which loan applicants would (or would not) receive funding from Valliance, knowing that those funds would be invested in BRHS or the Cook Enterprise, and that a portion of the same funds would enrich Valliance and Bruhn through interest paid on the loans, additional business to Valliance, and repayment of prior loans that Valliance had extended to the Cook Enterprise. Bruhn and Valliance were also responsible for persuading Cook's Partners that Valliance's reputation and authority as a financial institution would protect their investment in BRHS. Bruhn and Valliance knowingly provided banking services to the Cook Enterprise, and materially participated in the solicitation of potential Partners, while simultaneously knowing that the Cook Enterprise was insolvent.

179. Together, Cook (including the Cook Enterprise), Bruhn, and Valliance constituted an association-in-fact enterprise within the meaning of 18 USC 1961(4) and 1962(c), hereafter referred to as the "RICO Enterprise." Cook, Bruhn, and Valliance each participated in the operation or management of the RICO Enterprise.

180.    The RICO Enterprise functioned as a continuing unit over a period of time to achieve shared objectives.

181.    The RICO Enterprise engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

*Pattern of Racketeering Activity: Wire Fraud*

182.    The RICO Enterprise conducted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

183.    Between early 2018 and September 2019, the RICO Enterprise engaged in related and continuous acts of wire fraud connected with the repeated recruitment of Cook's Partners and their investments in the Cook Enterprise. These acts occurred on a frequent and regular basis as Cook continually received new cash inflows from Partners.

184.    Each act of wire fraud was part of the RICO Enterprise's continuous method of operation in which Cook's Partners would invest with the understanding that their funds would be used for the associated Flip Project or Client Project, but instead the RICO Enterprise—undisclosed to the Partners—used the Partners' funds to pay off existing investors, cover overdrafts, pay off Valliance on loans that it had extended to the Cook Enterprise, and misuse funds for Cook's personal benefit. Throughout 2018 and 2019, the RICO Enterprise continuously engaged in this practice of obtaining new Partners and new cash inflows in order to keep the Cook Enterprise afloat.

185.    The RICO Enterprise engaged in a scheme to defraud Cook's Partners for the benefit of Cook, Bruhn, and Valliance. The primary objective of the scheme was to keep the Cook Enterprise afloat despite its insolvency, so that Cook, Bruhn, and Valliance could continue to profit, and to accomplish this through defrauding Cook's Partners in order to obtain continual injections of new funds.

186.    Valliance knew and intended to participate in the RICO Enterprise with the goal of enriching Valliance (and indirectly, Bruhn) through the additional interest income it earned from the increased number of loans it was able to extend to the Partners as well as through Valliance's ability to secure repayments of loans that it had extended to the

Cook Enterprise, thereby avoiding losses that Valliance would have otherwise incurred had the Cook Enterprise—and the RICO Enterprise—terminated earlier. Through Bruhn's role at Valliance, he shared in Valliance's objectives for the scheme.

187. The RICO Enterprise used means of wire in interstate commerce to advance the scheme to defraud by, among other things, (1) sending and receiving emails with the Partners to solicit their investments in BRHS and the Cook Enterprise, (2) using emails and wire transfers sent by to and from the Partners to enter the BRHS Partnership Agreements with the Partners and to obtain their funds, and (3) using electronic processing centers located in states outside Texas to receive the wire transfers and checks sent by Cook's Partners.

188. The specific acts of wire fraud include each investment and corresponding transfer by Cook's Partners described in paragraph 40, above. For each of those investments, the RICO Enterprise acted with intent to defraud the investor as described in this Complaint.

189. The Federal Reserve Bank operates the Federal Wire Transfer Network ("Fedwire"), which is an electronic funds-transfer system used primarily for the transmission and settlement of certain payment orders.

190. At all times relevant to this Complaint, money transmitted by Fedwire was routed via electronic wire from its origin to its destination through New Jersey.

191. At all times relevant to this Complaint, the Federal Reserve Bank of Atlanta, which is located in Georgia, processes paper checks and electronic check images presented for payment from one bank to another.

192. Upon information and belief, for each transfer in the table in paragraph 40 of this Complaint that was sent as a wire transfer, the wire transfer was sent to a bank account owned by the Cook Enterprise via interstate wire through a processing center located in New Jersey.

193. Upon information and belief, for each transfer in the table in paragraph 40 of this Complaint that was sent as a check, the check was processed through the Federal

Reserve Bank of Atlanta via a processing center located in Georgia.

194.    The RICO Enterprise obtained money from the Partners under fraudulent or false premises by means of wire in interstate commerce when it communicated with the Partners to solicit and secure their investments without disclosing that (1) the Cook Enterprise was insolvent; (2) the Cook Enterprise was commingling funds across Cook's entities, (3) the Cook Enterprise was using Partners' funds to pay off existing investors, cover overdrafts, and repay Valliance on existing loans for different investors and properties instead of applying the funds for the purpose that Cook had represented to the Partners; and (4) Cook was diverting a portion of Partners' funds to his personal accounts for his own gain.

195.    The RICO Enterprise had the specific intent to defraud the Partners because Cook, Bruhn, and Valliance knew that the Partners' funds were being shifted among accounts for different entities; Cook, Bruhn, and Valliance knew that the Partners' funds were being improperly applied to cover overdrafts and amounts owed by entities other than the entity in which the investor had been told they were investing; Cook intentionally diverted a portion of the Partners' investments for his own personal benefit rather than using the entire investments in the Flip Projects or Client Projects as he had promised to the Partners; and Cook, Bruhn, and Valliance knew that Partners' funds were being used to repay Valliance's loans.

196.    Bruhn and Valliance participated in the management and operation of the RICO Enterprise by, among the other acts previously described, (1) providing reputational and banking support that allowed Cook to obtain investments from the Partners (often via loans from Valliance to the Partners); (2) knowingly implementing Cook's decisions by providing banking services to the Partners, enabling them to sign up with BRHS despite Bruhn and Valliance knowing of BRHS' insolvency; (3) exercising their broad discretion in choosing to provide banking services and loans to the Partners, and on what terms those services and loans would be provided; and (4) exercising their discretion in choosing to allow Cook to continue banking with Valliance despite his insolvency and substantial

overdrafts in his accounts.

197. Each of the predicate acts of wire fraud related to each other as part of a common plan of the RICO Enterprise to operate an ongoing fraud scheme for the personal benefit of Cook, Bruhn, and Valliance whereby new investor money was continually obtained to pay off previous loans and investors and keep the Cook Enterprise afloat so that Cook, Bruhn, and Valliance could extract personal benefits.

*Conspiracy*

198. Upon information and belief, Bruhn and Valliance, by knowing of the Cook Enterprise's insolvency and by participating in Cook's continued efforts to solicit investments, agreed that Cook would commit the predicate acts described above as part of the operation of the RICO Enterprise.

199. Bruhn and Valliance's agreement with Cook is evidenced by the conduct described in the prior paragraphs of this Complaint, including but not limited to paragraphs 117-120.

200. Bruhn and Valliance have unlawfully, knowingly, and willfully conspired together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

201. Upon information and belief, Bruhn and Valliance agreed to the overall objective of the conspiracy.

202. Upon information and belief, Bruhn and Valliance knew that they were engaged in a conspiracy to commit the predicate acts, they knew that the predicate acts were part of the racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.

203. Upon information and belief, Bruhn and Valliance knew about and agreed to facilitate the RICO Enterprise's unlawful scheme and pattern of racketeering activity as described in the preceding paragraphs.

*Damages*

204. As a direct and proximate result of Cook, Bruhn, and Valliance's conspiracy

and violations of 18 U.S.C. § 1962(d), the Cook Enterprise was damaged, Cook's Partners were also damaged, and claims were filed against Cook in his bankruptcy case. Trustee seeks to recover the amount of all Partners' claims in the bankruptcy case, plus treble damages and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

Trustee respectfully requests judgement be entered against Defendants as follows:

A.    Avoiding all transfers and payments from Cook and the Cook Enterprise to Valliance, and declaring that such amounts may be recovered from any and all parties set forth in 11 U.S.C. § 550(a), to the extent not both awarded and recovered as the result of this action (single satisfaction; § 550(d));

B.    Against Valliance, for the amount of all payments from Cook and the Cook Enterprise to Valliance;

C.    Against Valliance, for attorney's fees and costs incurred in bringing this action as awardable pursuant to Tex. Bus. & Com. Code § 24.013;

D.    Against Bruhn, for the amount of all claims filed in the Cook bankruptcy case, but in no event less than the amount of the Partners' claims;

E.    Against Valliance, for the amount of all claims filed in the Cook bankruptcy case, but in no event less than the amount of the Partners' claims;

F.    For Trustee's attorneys' fees and costs incurred in bringing this action to the extent awardable under law;

G.    Against Valliance and Bruhn for exemplary damages pursuant to Tex. Civ. Prac. & Rem. Code § 41.003, to include but not limited to the Trustee's attorneys' fees;

H.    Against Valliance and Bruhn for treble damages and attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c); and

I.    For such other and further relief as the Court may deem just and proper in this case.

In the event it is determined that this Court does not have jurisdiction to enter final judgement on any of the Trustee's claims herein, Trustee respectfully requests that the

Court enter its findings and conclusions and forward such to the District Court for further

consideration and final judgment.

DATED this 17th day of July, 2023.

STINSON LLP

/s/ Clarissa C. Brady
Jeffrey Goulder
Alisa C. Lacey
Michael Vincent
Clarissa C. Brady
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584

*Counsel for the Plaintiff*

I hereby certify that on July 17, 2023, I electronically transmitted the attached
document to the Clerk's Office using the CM/ECF System for filing and transmittal of a
Notice of Electronic Filing to all CM/ECF registrants.

/s/ Lindsay Petrowski
CORE/3524238.0002/181754413.1