1  Jeffrey Goulder (No. 010258)
   Alisa C. Lacey (No. 010571)
2  Michael Vincent (No. 029864)
   Clarissa C. Brady (No. 036312)
3  **STINSON LLP**
4  1850 N. Central Avenue, Suite 2100
   Phoenix, Arizona 85004-4584
5  Tel: (602) 279-1600
   Fax: (602) 240-6925
6  Jeffrey.Goulder@stinson.com
7  Alisa.Lacey@stinson.com
   Michael.Vincent@stinson.com
8  Clarissa.Brady@stinson.com
9  *Attorneys for Plaintiff*

10

11              **IN THE UNITED STATES BANKRUPTCY COURT**

12                 **FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| 13  In re | Chapter 7 |
| 14  SKYLER AARON COOK, | Case No. 2:20-bk-01730-EPB |
| 15            Debtor. | |
| 16 | |
| 17  JAMES E. CROSS, TRUSTEE, | Adversary No. 2:21-ap-00336-EPB |
| 18            Plaintiff, | |
| 19  vs. | **RESPONSE TO MOTION TO DISMISS COUNT VII (RICO) OF TRUSTEE'S THIRD AMENDED ADVERSARY COMPLAINT** |
| 20  VALLIANCE BANK, SHELBY BRUHN, and KATHERINE S. BRUHN, | |
| 21 | |
| 22            Defendants. | Hearing Date: TBD |
| 23 | Hearing Time: TBD Place: TBD |

24

25          James E. Cross, the Chapter 7 Trustee (the "**Trustee**") responds to Defendants'

26  Motion to Dismiss Count VII (RICO) of Trustee's Third Amended Adversary Complaint

27  (Dkt. 160) ("**Motion**"). This Response is supported by the following Memorandum of

28  Points and Authorities.

1    The fundamental principle that Defendants ignore in their Motion is that in the

2    Ninth Circuit, the Trustee is the ***only*** party with standing to bring the RICO claim.[1] No

3    creditor can assert it, so if the Trustee is denied the ability to bring this claim, then the

4    bankruptcy estate cannot recover the damages that Defendants have inflicted. This means

5    there will be no funds available to compensate the scheme's victims who have filed proofs

6    of claim. As far as the pleading of the RICO claim, the Complaint pleads this claim with

7    the required particularity and establishes a pattern of racketeering activity. As argued

8    previously and already decided in this case, *in pari delicto* does not apply.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1]    *See Estate of Spirtos v. One San Bernardino County Super. Ct. Case Numbered SPR 02211*, 443 F.3d 1172, 1175-77 (9th Cir. 2006), and Section VI herein.

## Table of Contents

I.    Background ................................................................................................3

II.   The Trustee Has Pled Wire Fraud with Particularity..................................5

    1.  Pleading fraud does not require hyper-technical details..................6
    2.  The Trustee has pled sufficient details regarding how wires were used to commit the fraud..................................................................9

III.  A Pattern of Racketeering Activity Exists. .............................................11

    1.  Closed-ended continuity exists because the Trustee has alleged a continuous series of racketeering acts over more than a year. .......12
    2.  Open-continuity exists because the predicate acts were part of the RICO Enterprise's regular way of doing business. ....................15

IV.   The Trustee is the Only Party with Standing to Assert the RICO Claim. ...............18

V.    *In Pari Delicto* Does Not Bar the RICO Claim. .......................................20

VI.   Katherine Bruhn is a proper defendant for collection purposes. .............21

VII.  Conclusion ..............................................................................................22

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allwaste, Inc. v. Hecht*,
  65 F.3d 1523 (9th Cir. 1995) ........................................................ 12, 13, 14, 15, 16

*In re Arizona Theranos, Inc., Litig.*,
  256 F. Supp. 3d 1009 (D. Ariz. 2017) ............................................................ 6

*Asghari v. Volkswagen Group of Am., Inc.*,
  42 F. Supp. 3d 1306 (C.D. Cal. 2013) ............................................................ 7

*Bayshore Capital Advisors, LLC v. Creative Wealth Media Fin. Corp.*,
  2023 WL 2751049 (S.D.N.Y. Mar. 31, 2023) .................................................. 14

*Biltmore Assocs., L.L.C. v. Thimmesch*,
  2007 WL 9723941 (D. Ariz. 2007) ................................................................ 21

*Calif. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
  818 F.2d 1466 (9th Cir. 1987) ..................................................................... 17

*Capitol Indem. Corp. v. Canon*,
  29 F.3d 630 (9th Cir. 1994) ......................................................................... 14

*CarrAmerica Realty Corporation v. Nvidia Corporation*,
  302 F. App'x 514 (9th Cir. 2008) ................................................................. 19

*Chang v. Wells Fargo Bank, N.A.*,
  2020 WL 1694360 (N.D. Cal. Apr. 7, 2020) ................................................. 7, 8

*Cirulli v. Hyundai Motor Co.*,
  SACV 08-0854 AG MLGX, 2009 WL 5788762, at *4 (C.D. Cal. June 12,
  2009) ...................................................................................................... 6

*Cooper v. Texas Gulf Indus., Inc.*,
  513 S.W.2d 200 (Tex. 1974) ....................................................................... 22

*Crown Paper Liquidating Trust v. Pricewaterhousecoopers, LLP*,
  198 F. App'x 597 (unpublished) (9th Cir. 2006) ........................................... 21

*In re Crown Vantage, Inc.*,
  2003 WL 25257821 (N.D. Cal. 2003) .......................................................... 21

*Drake Interiors, L.L.C. v. Thomas*,
  433 S.W.3d 841 (Tex. App. 2014) ............................................................... 22

ii

*Durning v. Citibank, Int'l*,
   990 F.2d 1133 (9th Cir. 1993) ........................................................................... 13

*FDIC v. O'Melveny & Myers*,
   61 F.3d 17 (9th Cir. 1995) .......................................................................... 20, 21

*Goernitz v. Kohner (In re Kohner)*,
   2014 WL 4639920 (Bankr. Ariz. 2014) (Collins, J.) ......................................... 20

*Gonzales v. Lloyds TSB Bank, PLC*,
   532 F. Supp. 2d 1200 (C.D. Cal. 2006) ............................................................ 8, 9

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989) ............................................................................... 12, 13, 16

*In re Hawaiian Telcom Commc'ns, Inc.*,
   483 B.R. 217 (Bankr. D. Haw. 2012) ................................................................ 21

*Hughes v. Consol-Pennsylvania Coal Co.*,
   945 F.2d 594 (3d Cir. 1991) .............................................................................. 13

*In re Hunt*,
   149 B.R. 96 (Bankr. N.D. Tex. 1992) ............................................................... 19

*Ikuno v. Yip*,
   912 F.2d 306 (9th Cir. 1990) ............................................................................ 17

*J.D. Marshall Int'l, Inc. v. Redstart, Inc.*,
   935 F.2d 815 (7th Cir. 1991) ............................................................................ 14

*Kayne v. Ho*,
   LACV0906816JAKCWX, 2013 WL 12120144 (C.D. Cal. May 9, 2013) ............. 19

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
   431 F.3d 353 (9th Cir. 2005) ............................................................................ 11

*Lorenz v. East West Bancorp, Inc.*,
   No. 2:15-cv-06336-CAS(FFMx), 2016 WL 199392 (C.D. Cal. Jan. 14, 2016) ...... 8

*In re Maui Indus. Loan & Fin. Co.*,
   454 B.R. 133 (Bankr. D. Haw. 2011) ................................................................ 21

*McGowan v. Weinstein*,
   505 F. Supp. 3d 1000 (C.D. Cal. 2020) ............................................................ 13

*Medallion Television Enterprises, Inc. v. SelecTV of Cal., Inc.*,
   833 F.2d 1360 (9th Cir. 1987) .......................................................................... 13

*Moore v. Kayport Package Exp., Inc.*,
   885 F.2d 531 (9th Cir. 1989) ........................................................................... 6, 9

iii

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) ............................................................... 6

*Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*,
437 F.3d 1145 (11th Cir. 2006) ........................................................... 20

*Osherow v. York*,
2019 WL 6048017 (W.D. Tex. 2019) ................................................... 21

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*,
520 F. Supp. 3d 1258 (C.D. Cal. 2021) ................................................. 6

*Polycast Tech. Corp. v. Uniroyal, Inc.*,
728 F. Supp. 926 (S.D.N.Y. 1989) ....................................................... 15

*In re Porter McLeod, Inc.*,
231 B.R. 786 (D. Colo. 1999) ............................................................. 20

*In re Radical Bunny, LLC*,
2011 WL 3896199 (Bankr. D. Ariz. 2011) ............................................ 21

*Resolution Tr. Corp. v. Stone*,
998 F.2d 1534 (10th Cir. 1993), *abrogated on other grounds by Boyle v. United States*, 556 U.S. 938 (2009) ................................................... 14

*In re Senior Cottages of Am., LLC*,
482 F.3d 997 (8th Cir.2007) ............................................................... 19

*Sever v. Alaska Pulp Corp.*,
978 F.2d 1529 (9th Cir. 1992) ............................................................ 17

*Smith v. Arthur Anderson LLP*,
421 F.3d 989 (9th Cir 2005) ............................................................... 18

*SolarCity Corp. v. Pure Solar Co.*,
2016 WL 11019989 (C.D. Cal. Dec. 27, 2016) ...................................... 17

*Estate of Spirtos v. One San Bernardino County Super. Ct. Case Numbered SPR 02211*,
443 F.3d 1172 (9th Cir. 2006) ..................................................... 18, 19, 21

*Spool v. World Child Int'l Adoption Agency*,
520 F.3d 178 (2d Cir. 2008).............................................................. 14

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ............................................................... 9

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................... 9

*Ticor Title Ins. Co. v. Florida*,
  937 F.2d 447 (9th Cir. 1991) ....................................................... 17

*United States v. Busacca*,
  936 F.2d 232 (6th Cir. 1991) ................................................... 16, 17

*United States v. Jinian*,
  725 F.3d 954 (9th Cir. 2013) ....................................................... 10

*Vemco, Inc. v. Camardella*,
  23 F.3d 129 (6th Cir. 1994) ......................................................... 14

*Wade v. Gaither*,
  623 F. Supp. 2d 1277 (D. Utah 2009) .......................................... 14

*In re Yellow Cab Cooperative*,
  602 B.R. 357 (Bankr. N.D. Cal. 2019) ......................................... 21

**Statutes**

11 U.S.C. § 541 ................................................................... 19, 20

11 U.S.C. § 544 ............................................................... 18, 20, 21

11 U.S.C. § 1123(b) ................................................................... 21

18 U.S.C. § 1962(d) ................................................................... 11

Tex. Fam. Code Ann. § 3.202(b)(2) ............................................. 22

**Other Authorities**

Bankr. R. 3001(f) ........................................................................ 9

Rule 9(b) ....................................................................... 5, 6, 8, 9

Rule 12(b)(6) .............................................................................. 9

v

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    Background**

Trustee's Third Amended Complaint (Dkt. 139), which added the Count VII RICO claim that is the subject of Defendants' present motion to dismiss, did not add material factual allegations vis-à-vis the Second Amended Complaint. *See* (Dkt. 101-1) (redlined comparison). The case still involves the same basic facts, which can be summarized as follows:

The bankruptcy estate in this case includes the Debtor's formerly operating businesses that Trustee refers to collectively in this case as the "**Cook Enterprise**,"[2] composed of Cook's interests in a number of Cook's alter ego entities. The **Cook Entities**[3] were each involved in renovating and flipping houses ("**Flip Projects**"). The Trustee seeks recovery for damages inflicted upon the bankruptcy estate arising from the conduct of the Defendants-Valliance Bank and its Chief Lending Officer and Texas Market President Shelby Bruhn. At all relevant times, Cook held at least a fifty percent (50%) interest in each of the Cook Entities and was the primary person responsible for all financial oversight and control of each business, which included management of bank accounts, payroll, invoicing, billing and cash management. The other fifty-percent (50%) interest in each of the Cook Entities were innocent members of management who would have been able to prevent the frauds had they known about them. In fact, certain of the innocent members are owed substantial claims by the estate.

The Complaint alleges that Valliance (through Bruhn) knew how Cook's "investment" scheme operated because Cook and Bruhn had discussed it and Bruhn was an integral part of Cook's communications with investors. (Complaint ¶¶ 26, 32-33).

---

[2]     All capitalized terms have the meaning as defined herein or as defined in the Third Amended Complaint.

[3]     CMC Industries LLC ("**CMC**"), CKE Holdings LLC ("**CKE Holdings**"), CKE Management LLC ("**CKE Management**"), and Buddy's Renovation and Handyman Services, LLC ("**BRHS**").

3

Valliance had to know how Cook operated because it created a program in which it made short-term loans to Cook's investors that were specifically tailored to facilitate investment with Cook and BRHS. (*Id.* ¶ 32). Bruhn and Valliance prolonged the business of the Cook Enterprise in order to assure that all obligations owed to Valliance were paid (financing on Flip Projects, payments on loans, and other substantial fees). The reasonable inference from these allegations is that Valliance understood, at least at a high level, how Cook's scheme operated because banks do not lend money without some understanding of how it is to be used, and Bruhn was also copied on emails to investors in which Valliance was touted as a partner. (*Id.* ¶ 33). Bruhn permitted Cook to repeatedly affirmatively represent to Cook Enterprise clients and BHRP Partners that Valliance Bank will be doing the financing on all of the Flip Projects, thereby "giving all of us an institutional backing that protects you, gives you accountability and transparency before and during the projects as well as allowing you to leverage your dollars for more projects." Moreover, Bruhn himself invested in the enterprise. (*Id.* ¶ 34).

Against this backdrop, Bruhn and Valliance knew that during 2019, Cook was insolvent and repeatedly over drafting his accounts and commingling funds between his accounts at Valliance that belonged to distinct entities. (*Id.* ¶¶ 41-96). Between January 2019 and August 2019, Cook's entities bounced checks drawn on accounts held at Valliance at least *257 times*. Valliance and Bruhn further knew that Cook was repeatedly shifting funds between accounts which is a suspicious activity (Ponzi scheme) that was reportable under Valliance's anti-money laundering (AML) policies and procedures. Often Valliance itself would perform the transfers from Cook's investors' accounts at Valliance to the appropriate Cook account. (*Id.* ¶ 102). Even more damning, Trinika Johnson was the same Valliance employee who would both alert Cook and Bruhn of overdrafts and then transfer third party investor funds from other Valliance accounts into Cook's accounts. (*Id.* ¶ 102). Such transactions served no legitimate business purpose, and should have been identified, investigated, and reported as "suspicious" transactions under Valliance's anti-money laundering (AML) program. Instead, while the Cook Enterprise

4

experienced its financial turmoil, Bruhn assisted Cook in collecting approximately $4 million from BHRS Partners. And Bruhn knew that investor funds were the source of repayment to Valliance for its loans to Cook, because he thanked an investor for allowing exactly that to happen. (*Id.* ¶ 103).

Finally, in August 2019, Bruhn met with Cook and discussed the $3 million operational loss to BRHS, yet Bruhn and Valliance did not stop Cook from continuing to collect investor funds through Valliance accounts or partnering with Valliance. (*Id.* ¶ 115). Despite the incredible series of substantial overdraws and suspicious activity in the Cook Enterprise accounts for close to a year, Bruhn and Valliance managed to prolong the existence of the Cook Enterprise to assure that Valliance received payment in full at the expense of all other creditors of the Cook estate. When "the music finally stopped," the only one that had a "seat" was Valliance—at the expense of the assets of the estate and the dramatically increased claims in this case.

The Trustee's RICO allegations explain how, through the foregoing conduct and knowledge, Defendants (Valliance and Bruhn) associated with Cook (collectively, the **RICO Enterprise**) to prolong the operation of Cook's Enterprise so that Defendants could profit from Cook's ongoing wire fraud as new investor money was recruited into the Cook Enterprise without disclosing to those investors that Cook was wildly insolvent and using their funds to cover debts owed to other investors. *See generally* (*id.* ¶¶ 176-204).

## II. The Trustee Has Pled Wire Fraud with Particularity.

Defendants repeat the Rule 9(b) arguments from their previous motion to dismiss, but now direct them to wire fraud because that is the predicate RICO act alleged in the Complaint. The wire fraud allegations share the ***same*** factual allegations as the claim for knowing participation in breach of fiduciary duty, which the Court already ruled has been pled with Rule 9(b) particularity. The only additions in the Complaint are the allegations that each of the fraudulent investor transfers—which were already identified in the Second Amended Complaint—involved wires. (Complaint ¶¶ 187-94). This addition does not undermine the existing factual allegations that amply plead fraud.

5

### 1. Pleading fraud does not require hyper-technical details.

Defendants' argument that pleading fraud requires hyper-detail about the "time, place, and specific content of the false representations," (Dkt. 161 at 12:2-5, 25-28), fails just as it did previously. First, the Trustee specifically alleges that (1) the BRHS Partnership Agreements that Cook entered with investors misrepresented that capital from those investors was to be used as working capital for BRHS and (2) Cook provided a personal financial statement to investors that misrepresented his assets by millions of dollars. (Complaint ¶ 23(i)). Those allegations alone are sufficient to plead fraud with particularity because the Trustee is not required to know every detail of the fraud in advance of discovery. "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989); *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 554-55 (9th Cir. 2007) (rejecting argument that plaintiff had to allege which employee performed the fraudulent act because requiring such a level of detail "as a precondition of bringing suit and commencing discovery would, as a practical matter, defeat almost any suit based on such a fraud.").

Second, Defendants ignore that the Trustee's theory of fraud is not based solely on false representations, but also on ***omissions***. Courts within the Ninth Circuit have repeatedly affirmed that "when an allegation rests on a claim of fraudulent omission, the Rule 9(b) standard is relaxed because 'a plaintiff cannot plead either the specific time of [an] omission or the place, as he is not alleging an act, but a failure to act.'" *Cirulli v. Hyundai Motor Co.*, SACV 08-0854 AG MLGX, 2009 WL 5788762, at *4 (C.D. Cal. June 12, 2009) (citation omitted); *accord In re Arizona Theranos, Inc., Litig.*, 256 F. Supp. 3d 1009, 1028 (D. Ariz. 2017). Thus, the usual requirement to plead "the time and place of the fraud, the statements made and by whom made, an explanation of why or how such statements were false or misleading when made, and the role of each defendant in the alleged fraud" does not apply. *Cirulli*, 2009 WL 5788762, at *4; *see also Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 520 F. Supp. 3d

6

1258, 1267 (C.D. Cal. 2021) ("[A] plaintiff in a fraud-by-omission suit faces a slightly more relaxed burden, due to the fraud-by-omission plaintiff's inherent inability to specify the time, place, and specific content of an omission in quite as precise a manner.").

"[T]o plead the circumstances of omission with specificity, [a] plaintiff must describe the content of the omission and where the omitted information should or could have been revealed." *Asghari v. Volkswagen Group of Am., Inc.*, 42 F. Supp. 3d 1306, 1325 (C.D. Cal. 2013). In this case, the Trustee did so:

- The investors signed Partnership Agreements that purported to detail the terms of the investments. (Complaint ¶ 23).

- Cook failed to disclose to his investors that "[t]he Cook Enterprise (including BRHS) was insolvent." (*Id.* ¶ 108).

- Cook failed to disclose to his investors that "he was engaged in circular intercompany transactions (i.e. a Ponzi scheme) to maintain the appearance of liquidity in the Cook Enterprise accounts and that he used the funds provided by Partners to satisfy outstanding obligations owed to Valliance, among other things." (*Id.* ¶ 109).

- The BRHS Partnership Agreements stated that the investor funds were to be used for "working capital" and failed to disclose that the Cook Enterprise would misuse them as described above.[4] (*Id.* ¶ 23(i)).

- Valliance and Bruhn, when they met face-to-face with Cook's investors, were aware of "the precarious financial situation of the Cook Enterprise" and failed to disclose this to investors whom Bruhn knew were about to invest, with a portion of that money enriching Bruhn and Valliance at the investor's expense. (Complaint ¶¶ 114, 119-20, 178, 186).

As the Trustee pointed out when Defendants raised this same demand for hyper-detailed pleadings in their previous motion to dismiss, *Chang v. Wells Fargo Bank, N.A.*,

---

[4] Additionally, any of the BRHS Partnership Agreements included in the proofs of claim shows that Cook failed to disclose the aforementioned material facts prior to closing the investments. *See, e.g.*, (2:20-bk-01730-EPB Claim 6-1 Part 7).

7

2020 WL 1694360, at *5 (N.D. Cal. Apr. 7, 2020) has squarely rejected their advocacy for the journalism questions of "who, what, when, why, where, and how." There, defrauded investors sued the fraudster's bank for aiding and abetting the fraud. On a motion to dismiss, the district court held that the plaintiffs' allegations satisfied Rule 9(b). Those allegations included that (1) the bank knew that the fraudster was managing investor funds, (2) the accounts were commingled, (3) the bank knew the accounts held investor money in a fiduciary capacity, (4) the bank knew that payouts from the accounts exceeded new inflows, (5) the customer was frequently bouncing checks, and (6) the bank processed transactions involving the inflows and outflows of investor funds. *Id.* at *5.

Finding those allegations more than sufficient, the *Chang* court squarely rejected Defendants' argument:

> While Defendants repeatedly argue that Plaintiffs must plead details like "who reviewed Equitybuild and its accounts," "when the accounts were allegedly reviewed," "what was learned about the 'nature of Equitybuild's business," or "how anyone at Wells Fargo actually discovered anything," Reply at 4, that is not the standard at this stage. *See Lorenz v. East West Bancorp, Inc*., No. 2:15-cv-06336-CAS(FFMx), 2016 WL 199392 at * 7 & n.4 (C.D. Cal. Jan. 14, 2016) ("For purposes of pleading an aiding and abetting fraud claim, ... actual knowledge of the underlying fraud may be averred generally," and "need not be pled with the particularity typically required by Rule 9(b)") (internal quotation marks and citations omitted). Whether Plaintiffs will be able to prove their allegation of actual knowledge is a question for another day.

*Id.* at *5.

Another case, *Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1207 (C.D. Cal. 2006), also involved similar circumstances where a third-party sued a defendant bank for aiding and abetting a breach of fiduciary duty by its customer. The bank moved to dismiss, arguing that Rule 9(b) had not been satisfied. The district court rejected the argument, finding that allegations explaining that the bank had actual knowledge of its customer's fraud, which included the bank's recognition that the account activity

8

resembled a Ponzi scheme, were sufficient because Rule 9(b) requires that knowledge "may be averred generally." *Id.* at 1207. Similarly, here the Trustee has pleaded more than sufficient facts for Defendants to prepare an answer to the allegations, as evidenced by the Defendants' detailed understanding of the allegations that is apparent in both their current motion to dismiss and the previous one. *Moore,* 885 F.2d at 540.

### 2. The Trustee has pled sufficient details regarding how wires were used to commit the fraud.

Defendants are dead wrong in claiming that the Trustee "fails to allege that the wires were used to facilitate any of the listed investments." (Dkt. 161 at 12:24-25). The Trustee pled wire fraud in detail across sixteen paragraphs of the Complaint. (Complaint ¶¶ 182-97). Paragraphs 188 through 193 of the Complaint allege that each investment listed in paragraph 40 was a check or wire transfer that involved a wire within the scope of wire fraud.

Defendants also ignored the Complaint's express incorporation of the proofs of claim. Paragraph 40 alleges that "[t]he following BHRS Partners have filed proofs of claim as creditors in the bankruptcy case," and for each investment, it lists the date of the payment, the amount of the payment, and—importantly—the "Claim No." on the Court's Claim Register. As documents referenced and incorporated into the Complaint, the proofs of claim are part of the pleading for purposes of evaluating a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ([C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *see also Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) ("[A] court may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned."); Bankr. R. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.").

9

These proofs of claim identify in detail the circumstances of each transfer constituting wire fraud. For example, in the first proof of claim listed in paragraph 40 (claim number 31), Brad Johnson states under oath that he invested $175,000 with Debtor on August 22, 2018 "to be used for Buddy's Renovation and Handyman Services, LLC." (2:20-bk-01730-EPB, Claim No. 31, at 4). Johnson attached a BRHS "Partnership Agreement" dated August 22, 2018 under which Debtor solicited and obtained Johnson's investment. (*Id.* at 5-7). As another example, the second proof of claim listed in paragraph 40 (claim number 6) likewise contains the investor's statement under oath, a copy of the relevant Partnership Agreements with BRHS, and a copy of checks used to transfer the funds. (Claim 6-1 Part 5, Part 7, Part 8). The Trustee has pleaded the wires with sufficient particularity, as the proofs of claim identify each instance that underpins the liability alleged.

Next, Defendants argue that the Complaint "fails to allege which financial institution received the funds" and that this is supposedly important because Valliance wouldn't have "knowledge or control over deposits made in other institutions." (Dkt. 161 at 13:7-11). Defendants misunderstand the allegations of the Complaint. The investors were defrauded when they sent money via wire in reliance upon statements that failed to disclose the Cook Enterprise's insolvency and history of Ponzi scheme intercompany transactions to cover negative balances. *E.g.* (Complaint ¶¶ 23(i), 108, 109, 114, 119-20, 178, 186). The specific location of the bank accounts that received the wires is not relevant to whether wire fraud occurred, nor is it an element of that crime. *See United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) (listing elements).

Defendants conspired with the Cook Enterprise to form the RICO Enterprise so that Defendants could profit by receiving payments from the Cook Enterprise. (*Id.* ¶¶ 178, 179, 186). The Trustee alleges (and Defendants do not dispute) that the investor wires went into accounts that Cook controlled as part of the Cook Enterprise. (*Id.* ¶ 40). Linking this to Defendants, the Trustee further alleges that the Cook Enterprise owed Valliance hundreds of thousands of dollars between 2018 and September 2019. (*Id.* ¶¶ 107, 176).

10

The Trustee also alleges that the Cook Enterprise actually paid Valliance hundreds of thousands of dollars on those loans between February 19, 2018 and February 19, 2020. (*Id.* ¶ 105). Defendants profited from their participation in the RICO Enterprise, and that Valliance frequently acted in dual roles as both provider of banking services and as a partner and conspirator with Cook does not mean that wire fraud requires that every dollar of ill-gotten gains had to be initially deposited in a bank account held at Valliance.

Finally, Defendants accuse the Trustee of "group pleading" by failing to state "which party took specific actions or made false statements, when these occurred, and with respect to whom." (Dkt. 161 at 13:13-16). Defendants selectively cite the Complaint to create a misleading impression. They ignore 100+ paragraphs about the specific acts that Cook and Defendants performed, and instead focus on three paragraphs where the Trustee explained the affairs of the "RICO Enterprise." (Dkt. 161 at 13 n.3). But RICO liability for conspiracy under 18 U.S.C. § 1962(d) attaches to Defendants even if they did not personally conduct the wire fraud, and RICO liability requires that the enterprise is distinct from the person. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). Thus, the existence of a few allegations in the Complaint directed towards the enterprise as a whole neither undermines the other 100+ paragraphs directed towards Defendants, nor does it constitute "group pleading."

## III. A Pattern of Racketeering Activity Exists.

Defendants next argue that the Trustee has not pled a pattern of racketeering. (Dkt. 161 at 14-16). Either closed-ended or open-ended continuity will satisfy RICO's continuity requirement, and the Trustee has established both. Closed-ended continuity exists because the predicate acts of wire fraud spanned approximately 1.5 years (with the particular acts in the Complaint spanning nearly thirteen months), which is more than sufficient to establish a pattern, particularly given that it was a Ponzi scheme with continuous investor inflows. Open-ended continuity also exists because the predicate acts were part of the "regular way of doing business" and thus threatened continued criminal conduct. This was not a one-time, single-purpose operation, but a continuous Ponzi

11

scheme—existing investors would be paid, new investors recruited, loans extended and received, new monies used to pay off old monies, and so forth.

### 1. Closed-ended continuity exists because the Trustee has alleged a continuous series of racketeering acts over more than a year.

All that the Supreme Court requires for closed-ended continuity is "a series of related predicates extending over a substantial period of time," *i.e.*, more than "a few weeks or months." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989). The Trustee alleges predicate acts spanning approximately 1.5 years—that the RICO Enterprise operated between "early 2018 and September 2019" to "engage[] in related and continuous acts of wire fraud connected with the repeated recruitment of Cook's Partners and their investments in the Cook Enterprise." (Complaint ¶ 183). The Trustee also alleges that each act of wire fraud was part of a "continuous method of operation" to obtain new cash flows and keep the scheme alive and the Cook Enterprise afloat. (*Id.* ¶ 184). Moreover, the specific investments (and acts of wire fraud) listed in the Complaint span more than a year (approximately thirteen months) (*Id.* ¶ 40). The Trustee has adequately alleged closed-ended continuity.

Defendants argue that one year is insufficient to establish a continuous pattern, but in *Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995), the Ninth Circuit rejected the notion that closed-ended continuity requires a fixed minimum duration and held that, on the facts alleged, thirteen months was sufficient. *Allwaste* involved the appeal from the 12(b)(6) dismissal of a RICO claim, and there the Ninth Circuit elaborated upon the Supreme Court's seminal case of *H.J., Inc. v. Northwestern Bell Telephone*, which had emphasized that RICO is concerned with "long-term criminal conduct," but with a "fairly flexible concept of pattern" such that "the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance." *Allwaste*, 65 F.3d at 1527-28 (citing *H.J.*, 492 U.S. at 243).

The Ninth Circuit rejected Defendants' exact argument: "Defendants argue that closed-ended continuity requires that predicate acts continue for at least one year. The

12

problem with Defendants' argument is that it misconstrues the flexible continuity requirement under RICO by creating a bright line, one-year rule." *Id.* The court noted the Supreme Court had explained that "it is 'difficult to formulate in the abstract any general test for continuity.'" *Id.* at 1528 (quoting *H.J.*, 492 U.S. at 241). "Thus, a bright line, one-year rule undermines *H.J. Inc.'s* principle that flexibility rather than rigidity should govern the application of RICO." *Id.* Because the plaintiff could "show that the predicate acts occurred over a substantial period of time, as much as thirteen months," the Ninth Circuit held that this was sufficient to establish closed-ended continuity: "Such a showing would have demonstrated that the criminal activity spanned a 'substantial period of time' and, therefore would have satisfied the continuity requirement." *Id.* The Ninth Circuit reversed the district court's grant of the motion to dismiss. *Id.* at 1531.

Defendants cite a handful of out-of-circuit cases to argue for a hard cutoff of about two years for closed-ended continuity. (Dkt. 161 at 15). But those cases declined to find continuity because in all but one of them, the scheme was limited to a single victim and a singular, short-term purpose, so there was no pattern of long-term criminal conduct. It is obvious that "a single alleged fraud with a single victim" does not make a ***pattern*** of long-term criminal activity, *Medallion Television Enterprises, Inc. v. SelecTV of Cal., Inc.*, 833 F.2d 1360, 1363 (9th Cir. 1987), so Defendants' distinguishable cases come as no surprise. *See also Durning v. Citibank, Int'l*, 990 F.2d 1133, 1139 (9th Cir. 1993) (no pattern when "alleged fraud consists of … dissemination of that one misleading document in conjunction with a single issuance of bonds"); *McGowan v. Weinstein*, 505 F. Supp. 3d 1000, 1012 (C.D. Cal. 2020) (some factors considered in evaluating a pattern under closed-ended continuity include "the number of victims" and "the occurrence of distinct injuries").

For this reason, none of Defendants' cases are on point. In *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991), the scheme was a "short term operation" where the defendants expected to operate for "only 120 days" to acquire specific parcels of land, so "defendants worked a single-scheme, single-victim (albeit a

13

class of victims) operation that lasted one year at most." In *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994), the predicate acts were fraud and extortion relating to only a single construction job with only a single victim, and no allegations that the defendant ever engaged in similar practices with any other parties. Thus, "a single victim and a single scheme for a single purpose over seventeen months" was not "long-term criminal conduct." *Id.* at 135. In *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991), the alleged violations involved a single victim and were predicated upon a single commercial transaction (a purchase agreement), so the court found "a commercial dispute between two parties to a contract, not a pattern of racketeering activity." In *Bayshore Capital Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 2023 WL 2751049, at *27 (S.D.N.Y. Mar. 31, 2023), there was "at most allege a single scheme to deprive [the plaintiffs] of their money through Defendants' misrepresentations" regarding investments, "akin to garden variety breach of contract and tort claims."

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184, 186 (2d Cir. 2008) did apply a fairly rigid two-year minimum, but the court evidently found the scheme fell short of a pattern: "At most, the amended complaint states that World Child's branch office fraudulently continued to process client cases over a period of several months following the fallout between Spool and Goolsby and the defection of Dibble and Whitaker." More significantly, *Spool* is not the law in the Ninth Circuit, which has rejected such bright-line rules and approved of shorter durations. *See Allwaste*, 65 F.3d at 1528 (thirteen months); *Capitol Indem. Corp. v. Canon*, 29 F.3d 630 (9th Cir. 1994) (sixteen months); *Wade v. Gaither*, 623 F. Supp. 2d 1277, 1286 (D. Utah 2009) ("At a minimum, Plaintiff's complaint can be construed to plead at least two to three instances of extortion over a period of nearly twelve full months, which is sufficient to establish a closed-ended pattern of racketeering activity and to allow this case to proceed."); *accord Resolution Tr. Corp. v. Stone*, 998 F.2d 1534, 1544 (10th Cir. 1993), *abrogated on other grounds by Boyle v. United States*, 556 U.S. 938 (2009) (finding a duration of seven to eighteen months sufficient for closed-

14

Case 2:21-ap-00336-EPB    Doc 188    Filed 08/28/23    Entered 08/28/23 16:30:13    Desc
                          Main Document        Page 19 of 27

ended continuity); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 948 (S.D.N.Y. 1989) (8.5 months).

Finally, in a footnote, Defendants attempt to squeeze down the duration of the predicate acts by arguing that the Trustee's Report to Court and Creditors and Objection to Plan Confirmation (Dkt. 121) shows that Cook "withdrew sums from Wells Fargo— not Valliance—between June and August 2019." (Dkt. 161 at 14 n.4). The Trustee's Report is not referenced in the Complaint and Defendants cannot at the motion to dismiss stage attach their own documents to rewrite the pleadings. Moreover, the cited pages of the Trustee's Report merely show that the Cook Enterprise additionally used a Wells Fargo account during that time period. (Dkt. 121 at 6). The Trustee alleges in the Complaint that Valliance was still very involved during June to August 2019. *See, e.g.*, (Complaint ¶¶ 47-50) (fifty bounced checks on Valliance accounts between June and August 2019); (*id.* ¶¶ 62-84) (twenty-one separate occasions between June and August 2019 where Valliance employee Trinika Johnson emailed both Cook and Bruhn regarding overdrafts); (*id.* ¶ 103) (describing August 2019 meeting between Bruhn and Cook Enterprise investor in which Bruhn thanked the investor for getting Valliance paid); (*id.* ¶ 115) (describing August 2019 meeting with Cook and Bruhn where Bruhn discussed BRHS's $3 million loss but took no efforts to cease BRHS's banking activities or avert Cook's continued activities). Defendants' footnoted argument is wholly without merit.

The Ninth Circuit has specifically warned against the error that Defendants now invite this Court to make: "[T]he district court assumed incorrectly that closed-ended continuity could not be established absent a showing that predicate acts occurred during a period lasting more than one year." *Allwaste*, 65 F.3d at 1530-31 (reversing dismissal). The Trustee has pleaded facts that, if proven, establish closed-ended continuity.

### 2. Open-continuity exists because the predicate acts were part of the RICO Enterprise's regular way of doing business.

Alternatively, the Complaint alleges a scheme that clearly satisfies open-ended continuity. "Open-ended continuity is shown by 'past conduct that by its nature projects

15

into the future with a threat of repetition.'" *Allwaste*, 65 F.3d at 1528 (quoting *H.J.*, 492 U.S. at 241). "Predicate acts that specifically threaten repetition or that become a 'regular way of doing business' satisfy the open-ended continuity requirement." *Id.* As discussed above, the Trustee alleges that the RICO Enterprise engaged in related and continuous acts of wire fraud as part of its ongoing business operations. (Complaint ¶¶ 183-85, 197).

Defendants do not challenge that the predicate acts were part of the RICO Enterprise's "regular way of doing business." Rather, they argue that there was no threat of continuity because the RICO Enterprise voluntarily ceased operating instead of being terminated by another. (Dkt. 161 at 15:20-16:4). This is inaccurate in two respects. First, the Trustee has not alleged that the RICO Enterprise voluntarily ceased its operations.[5] Second, the Ninth Circuit does not require that the scheme terminated via a third-party as a prerequisite for the threat of future criminal conduct. In *Allwaste*, the court found open-ended continuity (in addition to closed-ended) because the defendants' acts in soliciting kickbacks were made possible by their employment status and "were not connected to the consummation of any particular transaction;" therefore, there was no suggestion that the defendants would have ceased on their own. 65 F.3d at 1529. "The most logical inference to be drawn, therefore, is that these activities threatened to continue in the future and had become [the defendants'] way of doing business." *Id.*

In recognizing that acts that "could have recurred indefinitely," if not "fortuitously interrupted," threaten future criminal conduct, *Allwaste* cited *U.S. v. Busacca*, in which the Sixth Circuit recognized that "the threat of continuity need not be established solely by reference to the predicate acts alone; facts external to the predicate acts may, and indeed should, be considered. In sum, the totality of the circumstances surrounding the commission of the predicate acts are considered to determine whether those acts pose a

---

[5] The closest language in the Complaint is "ceased operations." (Complaint ¶ 116). On a motion to dismiss a RICO claim, dismissal is appropriate only if 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *H.J.*, 492 U.S. at 249-50. The Court must consider the facts alleged in the light most favorable to the Trustee.

16

threat of continuing criminal activity." *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991). There, the Sixth Circuit rejected the argument that the acts were "finite" in nature merely because they ended when the defendant faced their consequences. "[T]he threat of continuity must be viewed at the time the racketeering activity occurred," and the defendant had demonstrated that he would commit the acts if given the ability, so open-ended continuity existed. *Id. See also SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at *7 (C.D. Cal. Dec. 27, 2016) (open-ended continuity established where criminal acts were the "regular way of doing business" and there was no reason why the method of "business" wouldn't have continued had the defendants not been caught).

Similarly, the Trustee's Complaint, taken as a whole, alleges that the predicate acts were the regular way of doing business for the RICO Enterprise. Cook started, and with Defendants' participation, expanded a Ponzi scheme that operated with no endposts and no expiration date. The RICO Enterprise continually solicited new investors and took in funds via wire fraud. Future criminal conduct was threatened ***at the time of each predicate act***, which establishes open-ended continuity. *See Busacca*, 936 F.2d at 238; *Ikuno v. Yip*, 912 F.2d 306, 309 (9th Cir. 1990) (defendants' filing of two false annual reports carried threat of continuity because it would have continued had the company not terminated, and thus open-ended continuity existed); *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991) (forging three lien releases within a 13-month period "suggest[ed] that this practice had become a regular way of conducting business … satisfying the continuity prong of the pattern test).

Furthermore, that the RICO Enterprise involved a large scheme with numerous victims further establishes that the criminal acts were part of the way of doing business and threatened future criminal conduct. *See Calif. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1469 (9th Cir. 1987) (predicate acts over five-month-period constituted pattern of open-ended continuity in part because the scheme targeted the multiple victims rather than a one-time transaction with a single victim); *cf. Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992) (finding no open-ended

17

continuity where there was "a single episode with a single purpose which happened to involve more than one act taken to achieve that purpose" and distinguishing cases involving acts against multiple victims as part of the regular way of doing business). Both open-ended and close-ended continuity exist here.

## IV. The Trustee is the Only Party with Standing to Assert the RICO Claim.

In their continued failure to acknowledge the controlling case law within the Ninth Circuit, Defendants repeat their standing argument from their previous motion to dismiss, except now their subject is the RICO claim instead of the state law claims. *See* (Dkt. 45 at 28:12-22). The Court already rejected this argument, and Ninth Circuit law has not changed.

The Ninth Circuit has confirmed that a trustee has standing to assert claims for injury to the estate (as Trustee does here) even if that injury indirectly constitutes injury to actual creditors of the estate. The Trustee previously briefed this distinction at length in response to Defendants' previous motion to dismiss, and incorporates that discussion of Ninth Circuit case law herein. *See* (Dkt. 53 at 20:12-21:18); *Smith v. Arthur Anderson LLP*, 421 F.3d 989, 1004 (9th Cir 2005) (a trustee has standing to pursue a claim when a corporation is wrongly deprived of its assets, despite the inevitable indirect injury also inflicted upon the corporation's creditors), and the cases following *Smith* cited therein.

Defendants additionally argue that 11 U.S.C. § 544 bars the Trustee's standing in favor of Cook's creditors, (Dkt. 161 at 19:1-5), but that too is not the law in the Ninth Circuit. The Ninth Circuit has repeatedly held that claims for injury to the estate—which is what the Trustee alleges here—belong to the trustee and not to the creditors. *Estate of Spirtos v. One San Bernardino County Super. Ct. Case Numbered SPR 02211*, 443 F.3d 1172, 1175-77 (9th Cir. 2006) ("We affirm the judgment of the district court and hold that, as a creditor, plaintiff lacks standing to raise RICO claims on behalf of Basil's bankruptcy estate because only the bankruptcy trustee has standing to sue on behalf of the estate.") (concluding that an individual creditor lacked standing to assert RICO claim on behalf of the estate even if trustee was unlikely to pursue the claim; the trustee had exclusive

18

standing to assert the claim); *CarrAmerica Realty Corporation v. Nvidia Corporation,* 302 F. App'x 514, *at* 516 (9th Cir. 2008) ("The trustee's standing to sue on behalf of the estate is exclusive; a debtor's creditors cannot prosecute such claims belonging to the estate unless the trustee first abandons such claims.") (citing *Estate of Spirtos*); *see also Kayne v. Ho*, LACV0906816JAKCWX, 2013 WL 12120144, at *3 (C.D. Cal. May 9, 2013) ("[I]n light of the Ninth Circuit's statements in *... Estate of Spirtos* and its application of these principles in *CarrAmerica* … unless specifically permitted to sue, creditors have no standing to pursue RICO claims based upon the actions that allegedly caused the debtor entity to become unable to meet its financial obligations to such creditors").

The only case that Defendants cite in support of their argument is a thirty-year-old, out-of-circuit decision, *In re Hunt*, 149 B.R. 96 (Bankr. N.D. Tex. 1992). That case is neither dispositive nor consistent with Ninth Circuit case law. In *Hunt*, the court concluded that the bankruptcy trustee had no standing under 11 U.S.C. § 541 to pursue a RICO claim against third parties. The court applied *in pari delicto* (though it did not identify the doctrine by name), reasoning that because the debtor had participated in the wrongdoing and one racketeer cannot sue another under RICO, the debtor—and thus the debtor's bankruptcy estate—had no viable RICO claim that the trustee could assert. 149 B.R. at 101–02.

The Ninth Circuit, however, has rejected the misapplication of *in pari delicto* to standing. In *CarrAmerica Realty Corporation v. Nvidia Corporation*, the Ninth Circuit held that a bankruptcy trustee had standing to assert claims against those who had participated in wrongdoing along with the debtor. The Ninth Circuit expressly rejected the "*Wagoner*" rule, which it criticized as incorrectly conflating standing with *in pari delicto*:

> [T]he *Wagoner* rule has been much criticized and we decline to follow it. *See In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1003–04 (8th Cir.2007) (listing authorities rejecting *Wagoner* and concluding that the *in pari delicto* defense has nothing to do with trustee standing).

*Supra,* at 517.

The Trustee specifically alleges that the racketeering enterprise prolonged the existence of the Cook Enterprise and allowed continued damage *to the Cook Enterprise* (not particular creditors) so that Defendants could personally benefit. (Complaint ¶¶ 185-86, 184, 178; *see also* ¶¶ 154-59). The Trustee is asserting claims for harm to the Cook estate, not to individual creditors, and the Ninth Circuit is clear that the Trustee has standing to pursue those claims.

## V. *In Pari Delicto* Does Not Bar the RICO Claim.

Defendants similarly repeat their incorrect contention that *in pari delicto* bars the Trustee's claims. Defendants cite an Eleventh Circuit case, *Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145 (11th Cir. 2006), but this case is neither applicable nor consistent with Ninth Circuit law. In *PSA*, the application of *in pari delicto* rested solely on the extent of the debtor's bankruptcy estate: The Eleventh Circuit concluded that because 11 U.S.C. § 541 defined the estate as having the same legal interests as the debtor, and the debtor would have been subject to *in pari delicto*, the trustee was also subject to *in pari delicto*. 437 F.3d at 1150.

But the Trustee is not asserting a RICO claim based on section 541. The Trustee's state-law and RICO claims exist under 11 U.S.C. § 544, which permits the Trustee to "stand in the shoes of" Debtor's creditors. *PSA* does not discuss section 544, and in the Ninth Circuit, the *in pari delicto* defense does not apply to claims brought by a trustee standing in the shoes of creditors under section 544. *See Goernitz v. Kohner (In re Kohner)*, 2014 WL 4639920 *3-4 (Bankr. Ariz. 2014) (Collins, J.) (citing *In re Porter McLeod, Inc.*, 231 B.R. 786 (D. Colo. 1999), in which the district court clearly distinguished between the trustee's assertion of state law claims in his role as a creditor, under Section 544, rather than as the debtor). This is in accord with the Ninth Circuit's reasoning in *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995): "While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a ***trustee***, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law." (Emphasis added).

20

1    *O'Melveny* has been followed by *Biltmore Assocs., L.L.C. v. Thimmesch*, 2007 WL

2    9723941 (D. Ariz. 2007). *See also In re Hawaiian Telcom Commc'ns, Inc.,* 483 B.R. 217,

3    221 (Bankr. D. Haw. 2012); *In re Maui Indus. Loan & Fin. Co.*, 454 B.R. 133, 136 (Bankr.

4    D. Haw. 2011) ("in pari delicto defense is inapplicable when a trustee brings an action

5    under sections 544(b) and 548.").

6        Defendants also include a footnote in which they claim that Ninth Circuit courts

7    apply *in pari delicto* to bar trustee claims. (Dkt. 161 at 20 n.7). They raised these same

8    cases in their previous motion to dismiss, (Dkt. 45 at 31-32), and the Court has already

9    rejected this argument. As the Trustee explained in his response to Defendants' previous

10    motion to dismiss, in which Defendants raised this same argument, those cases are

11    factually distinguishable.[6] *See* (Dkt. 53 at 32 n.18).

12        The *in pari delicto* defense does not apply to the Trustee's RICO claim. Indeed, he

13    is the only party with standing to bring such claim seeking redress for damages to the

14    bankruptcy estate under *Estate of Spirtos* and its progeny.

15 **VI.**    **Katherine Bruhn is a proper defendant for collection purposes.**

16        Defendants raised this same argument in their previous motion to dismiss and it

17    again fails. Although the Trustee does not make independent allegations against Bruhn's

18    wife, Katherine Bruhn, she is a necessary defendant to this action because under Texas

19

20    [6]      *In re Yellow Cab Cooperative*, 602 B.R. 357 (Bankr. N.D. Cal. 2019), takes a legal "flying
leap" in determining that the Ninth Circuit's unpublished affirmation (*Crown Paper Liquidating*
21    *Trust v. Pricewaterhousecoopers, LLP*, 198 F. App'x 597 (unpublished) (9th Cir. 2006)) of the
district court's opinion in *In re Crown Vantage, Inc.*, 2003 WL 25257821 (N.D. Cal. 2003),
22    somehow overrules or undercuts the Ninth Circuit's statements in *FDIC v. O'Melveny & Myers*,
61 F. 3d 17 (9th Cir. 1995). *Crown Vantage* concerned the standing and rights of a post-
23    confirmation liquidating trustee whose claims can only derive from 11 U.S.C. § 1123(b). *Crown
Vantage* did not undertake any analysis of *in pari delicto*'s applicability (or non-applicability) to
24    claims "stepping into the shoes of" a creditor under Section 544, and it is unknown whether the
liquidating trustee, which is not the same as a chapter 7 trustee, had authorization to assert Section
25    544 standing. The liquidation trustee may have only had the right to assert the "debtor's" claims
under Section 1123(b). Alternatively, *Yellow Cab* is not binding upon this Court, and is contrary
26    to *FDIC v. O'Melveny & Myers*, as well as *Biltmore Assocs., L.L.C. v Thimmesch*, 2007 WL
9723941 (D. Ariz. 2007); *Osherow v. York*, 2019 WL 6048017 *6 (W.D. Tex. 2019); and *In re
27    Radical Bunny, LLC*, 2011 WL 3896199 (Bankr. D. Ariz. 2011).

28

laws, community property is split into "joint control" and "sole control" property. Joint control property does not require both spouses be named as defendants, *Drake Interiors, L.L.C. v. Thomas*, 433 S.W.3d 841, 852 (Tex. App. 2014), but binding "sole control" property requires naming each spouse, *Cooper v. Texas Gulf Indus., Inc.*, 513 S.W.2d 200, 202 (Tex. 1974). Katherine's sole control community property is subject to tort liabilities that her husband Bruhn incurs during their marriage, Tex. Fam. Code Ann. § 3.202(b)(2), and therefore is an appropriate source of relief.

**VII.    Conclusion.**

Defendants' lengthy motion to dismiss is largely a regurgitation of the arguments raised in their previous motion to dismiss, none of which have any more merit today than a few months ago, and the Court correctly denied that motion. The Trustee has thoroughly pleaded all of the elements of a RICO claim, and requests that the Court deny the motion.

DATED this 28th day of August, 2023.

**STINSON LLP**

*/s/ Alisa C. Lacey*

Jeffrey Goulder
Alisa C. Lacey
Michael Vincent
Clarissa C. Brady
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584

*Counsel for the Plaintiff*

I hereby certify that on August 28, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants, which constitutes service, pursuant to L.R. Bankr. P. 9076-1:

*/s/ Lindsay Petrowski*

CORE/3524238.0002/183970878.1

22